## Ex parte C. L. HARKINS.

No. A-1739.   Opinion Filed June 10, 1912.

(124 Pac. 931.)

1.    **HABEAS CORPUS—Proceedings—Hearing.** Where an application for a writ of habeas corpus is made to this court, without first having the matter passed upon by the judge of the district in which the case arose, unless sufficient reasons for failing to do so are shown, this court will consider the case as though the district judge, upon a full hearing, had denied the relief asked for.

2.    **CONSTITUTIONAL LAW—Construction—Provisions Relating to Bail.** In attempting to arrive at the intent and true meaning of the Constitution upon the subject of bail, we will discard all precedents based upon hairsplitting distinctions, finespun theories, and involved reasoning, and will give the Constitution that common-sense construction which it must have received at the hands of the people, whose votes adopted and placed it in force.

3.    **BAIL—Capital Case.** If it appears from the testimony in a capital case that the proof is evident that the petitioner is guilty, bail will be refused; and even if there may be reasonable doubt as to the guilt of the accused, yet, if, upon an examination of the entire record, the presumption is great that the accused is guilty of a capital offense, bail should be refused.

4.    **EVIDENCE — Weight and Sufficiency — Circumstantial Evidence.** While, to a limited extent, a false consistency of circumstances may be constructed, yet experience teaches that this is almost impossible where there are a considerable number of circumstances involved.

5.    **SAME.** The link and chain theory with reference to circumstantial evidence is unscientific in principle, and not in harmony with justice. This court therefore adopts the strand and cable theory as being more in keeping with reason and the administration of justice.

6.    **BAIL—Grounds for Refusal—Murder—Evidence.** For evidence which creates a great presumption of the guilt of applicant and requires the court to refuse bail, see opinion.

(Syllabus by the Court.)

Application of C. L. Harkins for writ of *habeas corpus.* Writ discharged, and petitioner remanded to the custody of the sheriff.

The material portions of the evidence taken upon the preliminary trial are as follows:

Mrs. Anna Grissom testified at the preliminary hearing that she lived at Delaware, Okla., about 50 feet from the home of Mr. Arvie Hurst. That she moved there on the 20th day of January, 1912. That she knew Elsie Adams, who lived at Hurst's house. Knew Mr. Hurst when she saw him, but had never met him. That she remembers the occasion of the Hurst house being burned along about the 3d day of February, 1912. That she saw Elsie Adams and Mrs. Hurst in the evening before the fire, and they appeared to be in good health. That she was the first person to discover the fire, and that her family were the first people to get there. That the fire was discovered about 10:30 o'clock that night. That their house is south of Hurst's house. That she had been at home that night about 35 or 40 minutes before the fire broke out. That there was no unusual noise before they discovered the fire. That she was the first person to fire a shot after the fire was discovered. Didn't hear a racket of any kind before the house was on fire. That they were in bed when they discovered the fire and noticed a light on the outside. That she fired all of the shots that were in the gun in rapid succession as soon as she discovered the fire. That Dr. Jones arrived on the scene a very short time after she discovered the fire. That when people got there the east end of the house had fallen in. It was a very small house, two rooms—very small rooms. The fire seemed to be in the east end of the house, which was the rear end. The bodies of Mr. and Mrs. Hurst and Elsie Adams were found in the west end of the house. "That we did not see anybody loitering around the premises when we came home that night." That there is a window in her house on the north towards where the fire broke out.

Mr. A. M. Grissom testified that he was at home on the night of the fire at Mr. Hurst's. That it broke out about 10:40, to the best of his knowledge. That he saw the bodies of Hurst and Elsie Adams after the fire. It was pretty hard to tell who they were. That, to the best of his knowledge, they were the bodies of

Mr. and Mrs. Hurst and Elsie Adams. That he got home that night about 10:30. He did not notice any fire as he came home. That he had been in bed but about five minutes when he discovered the fire. That he got up immediately and got his clothes on and walked out, and the blaze was coming out of the house. Charles Burnes and he went into the building and discovered the bodies. That, to the best of his belief, the bodies were undressed, except that the girl had on some underwear. The girl's body was next to the west door. Mr. Hurst's body was next to the door, near the bed, on the floor. Mrs. Hurst's body was in the middle of the house, with her head to the south and feet to the north, lying on her back. The stove was in the east end of the house. Was a cast-iron cook stove. That it was a one-room house, with a partition made of quilts. There was no stove in the west end of the house. When the fire was discovered, it was burning in the southeast corner, near where the stove was. That gas was burning in the stove. Witness does not know whether the fixtures were connected or disconnected at the time of the fire. The stove was setting up in good shape. That a tea kettle was setting on the stove. When the water was turned on the stove, it went to pieces. Could not say whether the gas was burning at the time he first went over to the fire. That there was a strong flow of gas that night. That he did not see anybody about the Hurst premises after he came home that night, prior to the fire. That he did not pass the Hurst house. Did not see any light of any kind at the Hurst house when he came home. That it was not five minutes from the time he discovered the fire until he went into Hurst's house. He went in on the north side. That he broke the screen and broke the window. That the bed was in the northwest part of the house. That the house was about 22 feet long east and west and fourteen feet wide north and south. When he looked in through the window, he discovered a bed, but could not see anybody at that time. Could not tell whether the bed had been occupied or not. That he did not try to go into the house at that time, but waited until the hose cart came. The clothing was burned off the bodies, with the exception of the undershirt of Mr. Hurst and

Statement of Facts.

a pair of gloves that he had on. The fire had reached the bodies before it was extinguished, and the bodies were badly burned. That Elsie Adams had on some underclothes.—

"My opinion is that the bodies fell in the position in which they were found. I don't think they were blown in that position by any explosion. There was no appearance of gas when I went to the window. There was some smoke. I don't think there was any gas in that part of the house. I did not smell any smoke when I came home that night."

Dr. J. P. Suddeth testified that he was the county physician of Nowata county. That he went to Delaware, Okla., in the early part of February, 1912, to view the bodies of Arvie Hurst and wife and Elsie Adams. That they were badly burned, very badly burned. The arms and legs were burned off, and the bones were burned. He found these parties at the office of the undertaker, Barbre. That the next day he went back to hold a post mortem examination on Elsie Adams and Arvie Hurst. Dr. J. R. Collins was with him at that time. That he took the viscera from the bodies of Arvie Hurst and Elsie Adams, and sent them to the state chemist to be analyzed. From Elsie Adams he took part of the lungs, part of the liver, and put it in one jar, and took the stomach of Arvie Hurst, the heart, part of the lungs, part of the liver, and part of the windpipe, and put that in another jar, in alcohol. These were delivered to J. L. Pinnell, deputy sheriff, to take to Dr. De Barr. That there was no indication of inhalation of gas shown by the windpipe. None of the bodies gave any indication of having inhaled flames. If there had been an explosion, and they had been killed before the fire, there would have been no indication of inhalation of flames.—

"From the investigation that I made of these dead bodies, I did not form any definite opinion as to the cause of their death. It takes an extremely hot fire to burn the flesh and bones of a human being. The burning of the clothing would not destroy the flesh and bones. I would say that the heat from the building alone was not sufficient to have consumed the bodies and bones of persons, if they were found there."

This witness testified that the deceased, Elsie Adams, was pregnant, and had been in this condition for four or five weeks.

Dr. Edwin De Barr testified that he was a chemist. Educated at the University of Michigan. Lived at Norman, Okla., and occupied the position of state chemist of this state, and had been an instructor in chemistry since September, 1892. That he had examined the viscera of 110 bodies in the last twenty years to determine the presence of poison. That there is a decided difference in the blood of a person who dies from a natural cause and of one who dies from the effect of poison. That there is a difference in the condition of the blood of the person who dies from poisoning and from the effect of inhalation of gas or flames. That J. L. Pinnell, of Nowata, delivered to him the viscera of one Elsie Adams and one Arvie Hurst in February, 1912, some time between the 5th and 10th of that month. That the packages in which these were delivered were wired up in a wooden box; the viscera being contained in two glass jars, with closed tops. That his investigation discovered one-eighth grain of morphine in the contents of the stomach, 1.132 grain of morphine in the liver, none in the lungs as the natural consequences would render it. This evidently was taken with whisky, from the color and stain being found in the contents of the stomach. That the windpipe and lungs did not show any traces of fire or heat. That Arvie Hurst did not come to his death from inhaling flames of gas. There was nothing to indicate that he was asphyxiated. That, in his opinion, Arvie Hurst was drugged, and probably oil poured over him, and then burned. That he examined the viscera of Elsie Adams. There was one-sixteenth of a grain of cyanide of potassium in the stomach. Found no cyanide of potassium in the lungs or the liver. That there was nothing particularly unnatural about the blood of Elsie Adams. That, in his opinion, she did not come to her death from inhaling flames or gas. That it was his opinion that she was drugged, and probably oil poured over her body, and then burned. That he found no poison in the alcohol in which these viscera were contained. There was nothing in the blood of Elsie Adams that showed that it had absorbed any of the cyanide of potassium. There was a very dangerous amount of cyanide of potassium found in the stomach, but that the inves-

tigation revealed that potassium cyanide was given in what might be called a deadly dose, and it stopped heart action. From the condition of the heart and lungs, it would indicate that it was right on the border of a deadly dose. From the examination of the viscera of Arvie Hurst, it was disclosed that breathing had practically stopped at the time he died. He was not inhaling gas.—

"From what I found in the parts of the viscera sent me, I could not say how much morphine his body had absorbed. I could not tell exactly how long the person had taken the poison before being burned. It might have been a full hour, or a few minutes. I arrived at the opinion that oil was poured over them before they were burned from the condition of the lungs; that is, the blood. I arrived at the amount of morphine in Arvie Hurst's stomach by analyzing, separating it, and weighing it. It took me fifteen days to make the analysis. Cyanide of potassium is a very deadly poison. It might be contained in the body of a person who ate peach seeds or bitter almonds. It could have been placed there after death. If these bodies had been killed by a sudden explosion, so sudden as to prevent the lungs from filling with gas, they would have been torn to pieces. It would be impossible to tell how much morphine it would take to produce stupidity enough in a living man to permit oil to be poured on him and set on fire. That would depend largely on the habits of the man. Hurst had taken more than one-eighth of a grain of morphine. I found some more in the liver, and I do not know how much was in the brain or the other organs. The brain is the best organ to work for morphine. Morphine stopped his breathing."

Willie Adams testified that he lived in Delaware, Okla., and was a brother of Elsie Adams, and knew the defendant, C. L. Harkins. That on the Tuesday before she was found dead he had tried to get his sister to leave Harkins. He objected to her staying at his house.—

"He told me that her mother was going to stay there. It was not true. That was the last time I saw my sister alive. I did not go to the fire. I went to identify the bodies, and, in my opinion, one of them was the body of my sister. I am married, and am working at Bingham's livery barn."

A. J. Barbre testified that he lived at Delaware, Okla., and was engaged in the mercantile business and undertaking busi-

ness.   That he took charge of the bodies of Arvie Hurst and wife and Elsie Adams.   Took them to his undertaking room. Dr. J. P. Suddeth held an examination there.   They took the contents of the stomachs, or viscera, and held the post mortem examination.   This was on Wednesday.—

"That I saw Elsie Adams on Saturday night before the fire, about 9:30.   It might have been a little later than that.   She was in company with Harkins, and came into my store and bought ten cents worth of candy.   Harkins gave her the money, and she bought the candy.   It was cream mixture, twenty cents a pound candy.   It was some time before the fire.   I finished checking up after they went out; went to bed, and I had not gotten to sleep when I heard a noise by the corner.   I got up and threw up the window, and some people said there was a fire. I did not go to the fire.   Some people said they did not think it would amount to much.   That there was nobody in the building.   I started to lock up the store, and about that time Mr. Hudson came in, and said for me to go and get the bodies.   I went.   There were about three or four bodies in the building. That about that time Mr. Harkins, and I cannot say who else was with him, came to the store.   Harkins told me who was in the building in the fire.   He said, 'I am positive that the three bodies were in the fire.'   I asked Mr. Harkins if I had not better go up and take charge of the bodies.   He said he did not know anything else to do.   I do not remember any remarks that he made.   I did not know Elsie Adams by name.   I had known her for a few years, or such a matter.   When she and Harkins came into the store, I did not know but what she was his daughter.   Harkins told me that one of the bodies was Elsie Adams.   I think he told me he had left her there, and that he had reason to know that she was in there.   I do not think he was in the undertaking room that night after I got the bodies. There was no poison in that candy that I sold that I know of.   I sold it to everybody.   I think Harkins came into the store on Tuesday and looked at the bodies; he was crying.   It must have been an hour or an hour and five or ten minutes after they bought the candy until I heard of the fire; and it was about an hour and fifteen minutes later that I saw the defendant with Hudson.   The fire was all over when I got up to the house; the bodies were half covered with charcoal.   Mr. and Mrs. Hurst's bodies were found at the west side of the building.   Arvie Hurst was lying with his head between the bedposts and the door, on

the north side of the room, lying across the door. His wife was lying on the west side of the room, head in the corner. Elsie Adams was about six feet away, head to the south, all drawed up in a knot. The window was one foot from where Arvie Hurst was lying. The bed that Mr. and Mrs. Hurst slept in was in the northwest corner in front of the window. They were both lying between the foot of the bed on the south side, in front of the door that was nailed up. Elsie Adams was four feet east of her bed. There was no stove in the west part of the house. There was one in the east part. They were in the same condition when the doctors made the *post mortem* as they were when I took them from the house."

Jessie David testified that she lived at Delaware, Okla., and knew the defendant, C. L. Harkins, and saw him at the time of the fire at Hurst's house on Saturday night. She met Harkins on her way back from the fire. He asked her where the fire was. This was near Barbre's store.—

"My mamma was with me, and she told him that it was the last house on that street. He started to go down the street, then turned north, went south, and turned north, and then we went on home, and we saw him no more. I did not know who the man was of my own knowledge. My mother was with me, and she knew who he was."

Myrtle David, mother of Jessie David, testified practically as set out in the petition of applicant, and therefore we will not set out her testimony herein.

Frank Hurst testified that he lived in Delaware, Okla., on the night of the 3d day of February, 1912, when his brother and wife were burned in the house in the north part of town. That he saw Harkins there that day. That he was at his brother's house during the evening before the fire. That he saw Harkins there that afternoon. He came in the afternoon, along about dark. He left about 7 or 7:30 to go to the Holiness church. He asked Elsie Adams to go to church with him. She said she did not believe she wanted to go. He asked her again, and she said, "I'm too lazy." He said, "Let's go," so she got up and went with him.—

"That was the last time I saw her alive. I saw her body after the fire. In the afternoon my brother and I went to the

shoe shop, barber shop, and skating rink, and, besides, got some meat and groceries. I left their house about fifteen or twenty minutes after Harkins and the girl left. When I left they were sitting close to the door on the south side of the house by the stove. Mrs. Hurst was sitting on the northeast side of Mr. Hurst. When I left, my brother got up and went out to see how cold it was. He said: 'I am going to bed; it's too cold to be out.' I said, 'I believe I will go to town.' He came to the door and said, 'When you come back, get in bed with me.' That was the last thing he said to me, and the last time I saw him alive. That was about 15 minutes till 8 o'clock, as near as I can remember. The stove was in the southeast corner of the house. That house was lighted with a coal oil lamp, which connects up with the gas pipe, an ordinary two-inch pipe with holes drilled in it. This pipe stuck out of the stove some. The mixer pin was out of the pipe. The pipe had been kicked down and afterwards refastened by being pushed together. The connections were not screwed close together. The door on the south side was about two feet from the stove. There were two beds in the house."

Bert Reid testified that he was in Delaware on Saturday night, February 3, 1912, at the dance hall. Knows C. L. Harkins when he sees him. Saw him that night at the dance hall about 10 o'clock. He stepped to the door of the dance hall, and noticed Harkins had either a red or white handkerchief on his neck. Came in and took his hat off and went out again.

William Woods testified that he lived in Delaware. Was living there on the 3d day of February, 1912. That he knows C. L. Harkins. Saw him on Saturday night, February 3d, at church with Elsie Adams, at the little prayer meeting that night. That they got to the church house about 8 o'clock. That he saw them after that. The last place he saw them was north of Harkins' house, going south. This was about 145 feet on the back alley, going in the direction of Harkins' house. This was about 8:30 o'clock. I did not have any watch that night. Was a moonlight night, very cold and snowy-like.

Etta Hudson testified that she lived in Delaware. Was there on the night of the fire. She saw the defendant, Harkins, that night at the dance hall and the skating rink. He was in the

dance hall and came to the door. Had on a dark suit and dark hat.—

"I think he had a handkerchief on his neck. I don't know what time this was. He walked in, took his hat off, looked around, and walked out. I was at the dance hall at the time I heard the fire. This was about twenty minutes before I heard of the fire."

Dovie Crupper testified that she lived at Delaware and knew Elsie Adams, and had seen the defendant, C. L. Harkins. Had a conversation with Elsie concerning attention paid her by Harkins. That was last fall, before the Adamses moved out of Delaware. She said she did not like him.—

"I said, 'If you don't like him, why do you go with him?' She said: 'I am afraid of him; he has threatened me.' I don't know how old Elsie was. She was about fifteen or sixteen. This conversation took place on the street where Barbre's store used to be. We talked quite a while. We just got to talking. We were acquainted. I can't give all of the conversation. I never paid any attention to how long we talked together."

J. L. Pinnell testified he is 47 years of age, deputy sheriff, and was designated to convey a package to Dr. De Barr, at Norman, Okla. That he received the package at Delaware. It was given to him by Drs. Suddeth and Carlin. That he took it to Dr. De Barr.—

"I know that the package was not disturbed from the time it was in my possession until I delivered it to Dr. De Barr. I received the package at Brunk's Pharmacy. It was never out of my sight until I delivered it to Dr. De Barr. When I first saw the package in Delaware, it was setting on the west side of the building in the undertaking establishment; I think it was Barbre's place."

Dr. J. B. Suddeth, recalled, testified that it would not be possible to insert poisons in the viscera without opening the viscera. Adds that the viscera of Elsie Adams, or of Arvie Hurst, had not been opened when it was delivered to the deputy sheriff to be taken to Dr. De Barr.

William Adams, recalled, testified he is a brother of Elsie Adams, and that she would be sixteen years old on the 30th day

of May, 1912; that he is 24 years old; and that Elsie was eight years younger than he was.

Mrs. John Wolf testified that her name is Myrtle Wolf. Lived in Delaware. Living there the 3d day of February, 1912. On that night she was at the dance hall in Delaware. Knows defendant, C. L. Harkins. Saw him that night at about 10 o'clock at the dance hall. He stayed there about five minutes.

A. M. Grissom testified that he lived in Delaware. Was the same Grissom that had heretofore testified in this case. That he saw C. L. Harkins on the night of February 3d at his (witness') house.—

"I had a conversation with him about where the people were. I said I supposed they were at McClure's. I had no thought of them being in the house. Harkins said he had taken the girl there, and all three were there at 9:30. This was the first knowledge that I had of the people being in there. We then got a lantern and went to look for them. I can't say whether he was there when we found the body. This was right after the fire was over. I do not know of anybody visiting Elsie Adams while she lived at Hurst's house. I did not hear Harkins say anything about her being his sweetheart; did not hear him make any demonstrations of grief that night. The fire did not consume the entire building. The north wall and the floor and the west end remained. When I went to the window in the west end of the building, there was not any fire there at that time; there was some smoke there. If the bodies had been covered with oil and been burned, I probably would have seen the fire when I opened the window."

Mrs. A. M. Grissom, being recalled, testified as follows: That she had a conversation with Mrs. Arvie Hurst on the afternoon before the fire.—

"She was in my house on that afternoon. She looked out of the window and saw the girl go away. She said the girl was going with Harkins. I asked her what her objections was to her going with Harkins, and she said she was an orphan girl and had been living with Harkins since she was a mere girl, and she asked Elsie why she didn't marry him, and she said she didn't seem to care for him. I saw Harkins that night after the fire. He came to my kitchen. I believe he asked me if I knew where the folks were. I said I supposed they had gone to the country to McClure's. He said he brought the girl home at 9:30. I

believe he said he did not go in the house; just went to the door. In the conversation that I had with Mrs. Hurst, she said that the girl didn't seem to want Harkins."

F. P. Larkins testified as follows: That he lived at Delaware. Living there in February, 1912. That he knew C. L. Harkins. That he saw him a day or two previous to the time the house was burned. That they were talking about some cattle and the probability of getting feed.—

"After we quit talking, I saw Harkins walk to the back of a poolroom and come back, and I saw him put some whisky in his pocket, a pint or half-pint bottle, I don't know which. I am not positive whether this was on Thursday or Friday."

Dr. E. M. Russell testified that he lived at Nowata. He was in the life insurance business. That by profession he was a physician. Is not in the active practice. That he heard the testimony by Drs. Suddeth and De Barr in reference to the condition of the windpipes of the dead persons. In his opinion, it is impossible for a person to inhale flame. That if people had been burned with kerosene oil, or any other oil product, and the viscera taken from their bodies and packed in alcohol and carried from Nowata to Norman, there would be no odor of petroleum in the viscera. That it takes from fifteen to twenty minutes for a person's body to absorb morphine. It is impossible to tell how much morphine it would take to kill a human being. It is impossible to estimate the amount of cyanide of potassium that would be fatal. One-fourth of a grain is generally considered fatal. Cyanide acts in a very few minutes after it is taken. Cyanide of potassium is supposed to kill in thirty minutes. Before death, there is a period of stupor. It would be a few minutes from that time before death would result. The most important symptom of morphine poisoning is stupor. If a person inhaled flames, the trachea would be blistered. Inhaled gas goes into the lungs.

W. F. Gillespie testified that he was the sheriff of Nowata county. That he went to Delaware on the night of February 3, 1912, and took charge of some bodies that had been burned in a building. That the bodies were badly burned. The eyes were

in the head; also the tongues. That the tongues stuck out about one-fourth inch.

J. E. Brookshire testified that he was a physician and surgeon. That he had been practicing this year. That it would depend on the condition of a person as to how much morphine it would take to stupefy him; that is, whether he was a habitual user of it or not. One-eighth to one-half grain would be an average dose. Cyanide of potassium is a very deadly poison, a muscle poison; also a nerve poison. From one-twelfth to one-eighth of a grain would kill a young girl sixteen to seventeen years of age. It is impossible to inhale flames into the lungs. Morphine taken by the mouth takes from fifteen to twenty minutes to take effect. Cyanide of potassium absorbs more quickly than morphine.

C. L. Harkins, defendant, testified as follows: That he received a card from Elsie Adams on the 20th day of January at the post office in Nowata. Card reads as follows:

"Hello, Lum, how are you? I ain't very well this morning. I had a chill yesterday. Well, Lum, I am getting tired of staying here. But I guess I will have to stand it a while. Daisy's children is getting along fine. Mama said she was getting tired of staying here. Silas wants us to get out and we don't no where to go. Lum send me a new gingham dress. Lum, Nonie said she saw you to church Sunday night. Well, I will close for this time. Hoping to hear from your soon. Your friend, Elsie."

Defendant also introduced his answer to said card:

"Nowata, Oklahoma, 1-20, 1912. Miss Elsie Adams. Dear Little Girl: I received your card O. K. I will try to see you soon, and we will try to fix things more pleasant. Tell your mother not to be discouraged. I will be there soon. Be good. Lum."

That in response to this postal card he went over to Hogshooter to see Elsie. It was Monday evening when he went there. "We drove from there to Nowata. Got to Nowata about five in the evening." This was the latter part of January.—

"At Nowata we stopped at the Silver Grill Cafe. I took the team to Ellis' barn. We went from there to Delaware. It is twenty miles from Silas Miller's to Nowata. From the Silver Grill Cafe went to the depot. Took the train and went to Dela-

ware. The train was late. Got to Delaware about 12 o'clock. Elsie's brother came over late in the afternoon, before dark. We were just getting ready to go to church. He came to the door and called Elsie. I said, 'Elsie, Bill wants to see you.' Bill and I had been, for some reason unknown to me, unfriendly, owing to some difference between his father-in-law, Carpenter, and me. Elsie was sixteen years, eight months, and four days old at the time of her death. I never thought of Elsie going back. He said he couldn't keep her. He said, 'I ain't able to take care of her.' He said: 'They belong in that county. I wish you would go to the county and do something for them.' He said: 'I wish you would get them back, so that they would get help from the county.' I told him that, if possible, I would get Silas Armstrong to be witness that they were not able to take care of themselves. When I took Elsie over to Delaware with me, I understood that her mother was to come on the Thursday following. When Bill came down there, the windows were partly blinded on the west and east. Bill Adams was on the west door, which is a large glass door, and has no blind there. There is no shutter to the two windows in the north end of the building. The others were kept partly blinded. Bill comes in. Bill started to cause trouble, and if he had not the girl would have been well to-day. He commenced to abuse her. I said: 'Bill, this is far enough. We are looking for her mother this evening. Silas said she will come here before Thursday.' So he kind of stopped butting in to make a disturbance. Elsie said: 'You told me you never wanted to see my * * * face again, so I ain't going with you.' I said, 'Well, there is no use of going to your brother.' She said, 'I will just go to Fronie's.' I said to Bill, 'If she is not coming back, I will come back and tell you where she stays.' So we went to church. The night was cold, and there didn't seem to be any gathering. She went to Fronie's, and I told Bill where she was at. I didn't take her to anybody else's house, because we were expecting her mother to come right away. Bill Adams was there to my house before sundown. I had seen Elsie on Saturday of the fire, about 1 o'clock, at Hurst's house. We walked downtown, then come back. We had decided to go to church. She wanted to hear Bill Altime preach, so went down to the Holiness church. When we came back from church that night, we went right straight home. We went by Barbre's and bought some candy. I tried to buy a pair of gloves. We went right from the church to Barbre's store, and then from Barbre's store to Hurst's. My house is southeast from Barbre's store. Hurst's is north and

a little bit east. It was about 9:30, I think, when we got to Hurst's house. I do not know whether the people were up. The door was locked. Everything was light inside when she opened the door. The house was light, and the fire was burning. I could tell by the roar of the stove. Everything seemed to be practically in the same condition. I didn't see any one of the folks; just waited to see everything was all right. She went inside and looked around. That was the last time I saw her. I went home. I don't remember when I was at the dance hall; I just stopped in. I don't know whether before or after I went home, but possibly as I came back. I stopped in and looked to see who was there. I asked her if she wanted to go to the dance, and she said, 'No.' I do not know why I went by the dance hall. I guess it was just to see the crowd. I had not had supper that night. I had a late dinner. I do not remember who I saw at the dance hall. I saw a number of people, but do not recall who they were. I remember Arthur Stout. I had on an overcoat that night. After I ate my supper, I had a couple of Sunday school leaves. I thought I would look them over. I teach at the Sunday school. The Sunday before we had two Sunday schools. I thought I would look over the Sunday school lesson. I read those over. After I had eaten my supper, I smoked. I heard a shot. So I got up from where I was sitting and went to the south door. I looked out and saw no fire. I just got back to my chair. In a few minutes. I heard another shot a little farther west. I opened the south door and looked out across the street in a southwestly direction. A few fellows were going to the fire, so I slipped on my overalls that I used and my hunting coat; tied a lady's scarf over my ears. I lived in the southeast corner of the block. I goes down on the walk. I met three ladies. I suppose they were Mrs. David and the girls. They said it was not worth going to; it was all over. I asked where it was, and they said up on this street. I passed them and was going home. I said, 'Did you find whose house it was?' They said: 'No; I didn't learn. It was the last house on this street. The little house behind the big one, the last house.' I knew it was Hurst's house. I met some one and asked whose house it was. They said Arvie Hurst's. I asked where the folks were, and he said, 'I don't know, unless they went to Wilson's.' I knew they didn't come to my house, so I hurried, and when I got up to my house they were not there. I asked several where the folks were. They told me they were at Wilson's. I knew better than that. They were here at 9:30. I brought the young lady there. I said, 'Don't the folks over there know something

about?' Some one said, 'Let's go in and see.' I said, 'I will go with you.' So I went in. I asked the lady where the folks were, and she said she didn't know. I asked if any had been seen around. I brought the girl there at 9:30; they was in at 7:30. I am awfully afraid that something is wrong. I ran out of the house. I said I was going in, and Charlie Barnes went too. I stepped on a wire mattress. I couldn't see anything. Just then Barnes said, 'Here is one of the bodies.' I looked and saw it was the girl's body. I went out. I didn't say much more. I think Will Adams objected to the girl being with me because his father-in-law and me were at outs. I told the old man to quit stealing from me, or I would prosecute him. Before Bill and I were on good terms. Elsie and her mother and brothers had lived with me in the same house for quite a while. They did my cooking. I have always taken an interest in them, for the last four years more specially. Bill was the first one to come to work for me. I knew Mrs. Hurst well. I knew her before she was married. She was Bill Adams' girl. Bill and her went together. I never called on her myself. Never took her any place. Bill and Buddy Adams worked for me. They had nothing to live on. Three years ago they had sickness in the south part of town. We found them, and they had nothing to live on. We got something for them. So I told Bill if we could get arrangements to take them until we could—[Here record is blank.] The folks had worked for me the last four years, and part of the time living in the same house. During that time Elsie went with me wherever she wanted to go. The old lady didn't seem to care where she went. We went to neighbors' and to any place that we wanted to go. I was always kind and good to her. She was my sweetheart. We frequently went to church, visited the neighbors, and uptown together. Elsie and I were to be married on the next Wednesday. We were waiting for her mother to come. She would not go to her brother's. I knew there was nothing wrong about her staying with me. It was understood that we were to be married. A definite time was not set. We had been aiming to wait until she was 17. I am a veterinary surgeon and handle drugs. Don't use morphine. Have whisky sometimes. Didn't have any whisky on the 3d day of February, or on the Friday before that. I took a drink of whisky on Thursday or Friday. Didn't have any in my pocket. Never use cyanide of potassium. Never saw a particle of it. Don't know what it is. The drugs I handle are lotem, vacamu, pancern arsenic. crystolos."

Sol Armstrong, being sworn, testifies as follows:

"Live at Delaware. Knew Arvie Hurst and C. L. Harkins. As far as I know, they were on friendly terms. Seen them to church. They were all together. I am assistant pastor of the Missionary Baptist church. They were there on Wednesday night prior to the burning of the house on Saturday. Mr. Harkins and Elsie Adams were sitting in the front row. Mrs. Hurst was in the second row. Mr. Hurst was next to her. I never heard of any difficulty between C. L. Harkins and Arvie Hurst."

W. P. Lewis lived eight miles northwest of Nowata. Knew C. L. Harkins. Knew Elsie Adams. That the relation between Harkins and Elsie Adams was sociable, and that he had a conversation with Harkins on the day the girl was to be buried, but had never heard any conversation by either of them that they intended to get married before Elsie died. Harkins assisted the Adams family financially, and they seemed to be on friendly terms with him.—

"I never saw anything in the conduct of Harkins and Elsie Adams that led to any suspicion whatever. I have known Adams family for fifteen or sixteen years; known Harkins for ten or eleven years. I knew the Rockwood family; also that Harkins had some trouble with the Rockwood family over one of the girls. I do not know what it was. They tried to prosecute him."

A number of *ex parte* affidavits were filed on the part of the petitioner, and also for the state. They do not alter the main facts of the case, and it is not necessary to copy them here.

*Bert Van Leuven,* for petitioner.

*Smith C. Matson,* Asst. Atty. Gen., and *Bert Tillotson,* for the State.

FURMAN, P. J. (after stating the facts as above). The petition for *habeas corpus* in this case was first presented to the Honorable T. L. Brown, judge of the Second judicial district, and for some reason, which is unexplained, he did not pass upon the merits of the case, and the petition was withdrawn, at his request, and then presented to this court. The effect of this is

the same that it would have been if he had heard the case and refused bail.

It is not a necessary prerequisite to the issuance of a writ of *habeas corpus* by this court that the case should have been previously passed upon by the judge in whose district the case is pending; but, owing to the great volume of business which we have before us, and the further fact that the judge of each district is acquainted with the conditions existing therein, and knows better what weight should be given to the testimony of the witnesses, we think it is the safer policy that, before coming to this court with a petition for *habeas corpus,* the matter should first be submitted to the proper district judge, where justice can be administered much more cheaply and expeditiously. Where counsel do not take this course, but apply first to this court for relief, the inference is natural that they must have some reason beneficial to their client for doing so; otherwise they would not incur this additional expense, trouble, and loss of time. It amounts almost to a confession that the district judge would deny the relief asked. Of course, this would not apply in a case where the district judge was sick or absent from his district, or for any reason could not act expeditiously upon the case. Neither would it apply in a case where the district judge was disqualified; but none of these conditions are shown to exist in this case. We therefore feel that we should treat this cause as one in which the district judge had heard the evidence, and had decided that bail should not be granted. So we will start out, in considering this case, as though Judge Brown, upon a full hearing, had denied bail to the petitioner. This places an additional burden upon the petitioner to show that he was entitled to bail.

The first question to be considered is as to what extent this must be shown. Section 16, Williams' Const. of Okla., is as follows:

"All persons shall be bailable by sufficient sureties, except for capital offenses, when the proof of guilt is evident, or the presumption thereof is great."

There are two conditions in this provision, under either or both of which bail should be refused. First, in a capital case, when the proof of the guilt of the accused is evident; second, where from the evidence in a capital case the presumption of the guilt of the accused is great. In attempting to arrive at the intent and true meaning of this provision of the Constitution, we will discard all precedents based upon hairsplitting distinctions, finespun theories, and involved reasoning, and will give to the Constitution that common-sense construction which it must have received at the hands of the people, whose votes adopted and placed it in force. It is true that the intention of the framers of the Constitution is entitled to great respect; but it must also be remembered that the Constitution derives its power and authority from the people, who adopted it. The question then is: What did the people have a right to believe that it said and meant when they voted for it? This can only be determined by giving the words used in the Constitution that import which is given to such words in everyday use among the people in the common affairs of life. From this standpoint, there is absolutely no uncertainty as to what the provision of our Constitution now under consideration means.

Under the first clause of this provision, if the guilt of the accused is evident (that is, free from reasonable doubt), then bail must be refused; but, on the other hand, as that which is involved in reasonable doubt cannot be evident, if, on a review of the entire evidence, there is a reasonable doubt as to the guilt of the accused, it could not be said that his guilt was evident, and he would, if this provision stood alone, be entitled to bail as a matter of right. But the Constitution does not let the matter rest here, but goes further and, using the disjunctive conjunction "or," states that bail should also be denied when the presumption of the guilt of the accused is great. From a common-sense standpoint, the people must have understood that the last words used mean something, and that they do not constitute a mere rhetorical flourish. We therefore conclude that, although the guilt of the accused might not be free from reasonable doubt,

yet, if, from the entire testimony, there arose a great presumption of the guilt of the accused in a capital case, he should be refused bail.  It is true that on a final trial the accused cannot be convicted upon a presumption arising from the preponderance of the testimony, but must be proven guilty beyond all reasonable doubt; but when it comes to an application for bail, under the express provisions of our Constitution, the rule is different.  The reason for this distinction is plain.  The verdict of the jury is intended to be final and permanent; the judgment denying bail is only temporary.  It merely says there is so much evidence against the accused that it is best that he be restrained of his liberty pending a final trial.  Of course, this does not mean that he should be denied bail upon a mere preponderance of the testimony.  It only means that this preponderance must be so strong as to constitute a great presumption of guilt.

This is a case depending entirely upon circumstantial evidence.  While, to a limited extent, a false consistency of circumstances may be constructed, yet experience teaches that this is almost impossible where there are a considerable number of circumstances involved.  A single circumstance, standing alone, might amount to but little, and be entirely consistent with innocence, yet, when this circumstance is considered in connection with other circumstances, they are to be taken and combined together and may result in an irresistible conclusion of the guilt of the accused.  As was said by this court, in the case of *Ex parte Hayes et al.,* 6 Okla. Cr. 333, 118 Pac. 609:

"We think that the application of the chain theory to circumstantial evidence is improper.  No chain is stronger than its weakest link, and will never pull or bind more than its weakest link will stand.  With its weakest link broken, the power of the chain is gone; but it is altogether different with a cable.  Its strength does not depend upon one strand, but is made up of a union and combination of the strength of all its strands.  No one wire in the cable that supports the suspension bridge across Niagara Falls could stand much weight; but when these different strands are all combined together they support a structure which is capable of sustaining the weight of the heaviest engines and trains.  We therefore think that it is erroneous to speak of cir-

cumstantial evidence as depending upon links; for the truth is that in cases of circumstantial evidence each fact relied upon is simply considered as one of the strands, and all of the facts relied upon should be treated as a cable."

Applying these principles to the evidence before us, first, was a crime committed? Take the testimony of Dr. Edwin De Barr. He is professor of chemistry in our State University, and is known to the people of Oklahoma as an eminent scientist and a gentleman of the highest character for intelligence, integrity, and impartiality. He testifies that he found morphine in the stomach and liver of Arvie Hurst, which was evidently taken with whisky; that the windpipe and lungs of said deceased did not show any traces of fire or heat, and that the deceased did not come to his death from inhaling flames or gas; that, in his opinion, the deceased was drugged and then burned; that there was nothing to indicate that he was asphyxiated; that, in his opinion, deceased was drugged, and probably oil was poured over him, and then burned; that he examined the viscera of Elsie Adams; that he found one-sixteenth of a grain of cyanide of potassium in her stomach; that, in his opinion, she did not come to her death from inhaling flames or gas; that she was drugged, and probably oil was poured over her body, and then burned. This evidence raises a great presumption that Elsie Adams and Arvie Hurst were foully and brutally murdered. Petitioner was the last person seen with Elsie Adams, and had taken her home that night. It was proven by his own statements that he was at the house where the fire occurred about one hour before the fire was discovered. It was also proven, and not denied, that she was pregnant. Petitioner admits that she was his sweetheart. He admitted having had trouble with one of her brothers about the girl, and said "Bill started to cause trouble, and if he had not the girl would have been well today." This is a most significant and damaging admission. Petitioner stated this as a fact. Then the inference is irresistible that he knows more about how her death was produced than he disclosed on the witness stand. There is nothing in the record that indicates that any person, other than the petitioner, was the

father of her unborn child. Petitioner was proven to be a veterinary surgeon, and must have been familiar with drugs and poisons. After taking her home on the night of the fire, he went back to what was called a dance hall, but only remained there for a few minutes. As he had no business at the dance hall, and did not speak to any one there, this looks like preparation to prove an alibi. He had ample time to return to the house and complete his deadly work. He testified he was to marry Elsie Adams within a week. It is therefore argued it would be unreasonable for him to try to kill her. If his conduct had been reasonable, it would not have been criminal; for crime is always unreasonable. What could be more unreasonable, and therefore more criminal, than the seduction of a sixteen-year-old girl, in the sacred name of love, by a mature man of the world? Read pages 181 and 182 of 5 Okla. Cr., 114 Pac. 269, 270, *Hast v. Territory.* Is there any crime which such a man would hesitate to commit, if it suited his purposes? No man can tell what a man will do who has been entertaining illicit relations with a girl. Such conduct could not even be understood by King Solomon, although he was the wisest man who ever lived; for in the eighteenth and nineteenth verses of the thirtieth chapter of Proverbs he says:

"18. There be three things which are too wonderful for me, yea, four, which I know not:

"19. The way of an eagle in the air; the way of a serpent upon a rock; the way of a ship in the midst of the sea; and the way of a man with a maid."

If Solomon with all of his wisdom and long and varied experience could not understand these things, how can they appear reasonable to ordinary mortals? We only know from experience that illicit love has been the most prolific source of murder from the most ancient days to the present time. Take the case of King David. In the eleventh chapter of II Samuel, beginning with the second verse, we find the following:

"2. And it came to pass in an eventide, that David arose from off his bed, and walked upon the roof of the king's house; and from the roof he saw a woman washing herself; and the woman was very beautiful to look upon.

"3. And David sent and inquired after the woman. And one said, Is not this Bathsheba, the daughter of Eliam, the wife of Uriah the Hittite?

"4. And David sent messengers, and took her; and she came in unto him, and he lay with her; for she was purified from her uncleanness; and she returned unto her house.

"5. And the woman conceived, and sent and told David, and said, I am with child.

"6. And David sent to Joab, saying, Send me Uriah the Hittite. And Joab sent Uriah to David.

"7. And when Uriah was come unto him, David demanded of him how Joab did, and how the people did, and how the war prospered.

"8. David said to Uriah, Go down to thy house, and wash thy feet. And Uriah departed out of the king's house, and there followed him a mess of meat from the king.

"9. But Uriah slept at the door of the king's house with all the servants of his lord, and went not down to his house.

"10. And when they had told David, saying, Uriah went not down into his house, David said unto Uriah, Camest thou not from thy journey? Why then didst thou not go down unto thine house?

"11. And Uriah said unto David, The ark, and Israel, and Judah, abide in tents; and my lord Joab, and the servants of my lord, are encamped in the open fields; shall I then go into mine house, to eat and to drink, and to lie with my wife? As thou livest, and as thy soul liveth, I will not do this thing.

"12. And David said to Uriah, Tarry here to-day also, and to-morrow I will let thee depart. So Uriah abode in Jerusalem that day, and the morrow.

"13. And when David had called him, he did eat and drink before him; and he made him drunk; and at even he went out to lie on his bed with the servants of his lord, but went not down to his house.

"14. And it came to pass in the morning, that David wrote a letter to Joab, and sent it by the hand of Uriah.

"15. And he wrote in the letter, saying, Set ye Uriah in the forefront of the hottest battle, and retire ye from him, that he may be smitten, and die.

"16. And it came to pass, when Joab observed the city, that he assigned Uriah unto a place where he knew that valiant men were.

"17. And the men of the city went out, and fought with Joab; and there fell some of the people of the servants of David; and Uriah the Hittite died also.

"18. Then Joab sent and told David all the things concerning the war;

"19. And charged the messenger, saying, When thou hast made an end of telling the matters of the war unto the king,

"20. And if so be that the king's wrath arise, and he say unto thee, Wherefore approached ye so nigh unto the city when ye did fight? knew ye not that they would shoot from the wall?

"21. Who smote Abimelech, the son of Jerubbesheth? Did not a woman cast a piece of a millstone upon him from the wall, that he died in Thebez? Why went ye nigh the wall? Then say thou, Thy servant Uriah the Hittite is dead also.

"22. So the messenger went, and came and shewed David all that Joab had sent him for.

"23. And the messenger said unto David, Surely the men prevailed against us, and came out unto us into the field, and we were upon them even unto the entering of the gate.

"24. And the shooters shot from off the wall upon thy servants; and some of the king's servants be dead, and thy servant Uriah the Hittite is dead also."

What could have been more unreasonable than the conduct of King David? Illicit love caused both Beattie and Richeson to go to the electric chair within the last few months; and the courts are constantly filled with murder cases which grow out of such relations. Petitioner testified that he was a Sunday school teacher. Richeson was a preacher. The illicit relations existing between Richeson and his victim caused him to poison her with the very drug which, according to the testimony of Dr. De Barr, sent poor, trusting Elsie Adams to her death. Had it not been for the fact that Richeson's victim was in a delicate condition, he could have broken off his engagement with her; but he knew that what had passed between them would soon tell its own tale and involve him in ruin. Hence she must be put out of the way. Elsie Adams was also in a delicate condition, and her brother had been causing trouble. If she remained alive, her condition would soon become public. Petitioner stated that, had it not been for the brother causing trouble, Elsie Adams would be well

today. If he knew why she died, he must also know how she died, and who killed her. If he knows these things, how can he be innocent? There are many other incriminating circum-. stances in this case; but it is not necessary for us to discuss the testimony further, as what has been discussed fully sustains the conclusions at which we have arrived. We believe that under both provisions of the Constitution bail should be refused in this case.

The writ of *habeas corpus* is discharged, and the petitioner is remanded to the custody of the sheriff of Nowata county to await trial on the charge now pending against him.

ARMSTRONG and DOYLE, JJ., concur.