## CHARLEY WALKER v. STATE.

No. A-3956.  Opinion Filed Dec. 20, 1921.
(202 Pac. 799.)

(Syllabus.)

Homicide—Murder—Insufficiency of Evidence to Warrant Death Penalty. In a prosecution for murder, evidence reviewed and held sufficient to sustain a verdict convicting the defendant of murder, but insufficient under the facts and circumstances of the case to justify the death penalty, and the judgment and sentence of death is modified to imprisonment for life at hard labor.

Appeal from District Court, Pittsburg County; Harve L. Melton, Judge.

Charley Walker was convicted of murder and sentenced to death, and he appeals. Modified and affirmed.

J. W. Crow and Lewis Morris, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall, Asst. Atty. Gen., for the State.

DOYLE, P. J.   This appeal is from a judgment of conviction in the district court of Pittsburg county, rendered February 1, 1920, in pursuance of a verdict finding the defendant guilty of murder and assessing his punishment at death.   The information in substance charged that in said county on or about the 30th day of July, 1920, the defendant, Charley Walker, did kill and murder one C. L. Harkins, by striking, stabbing, and cutting the said Harkins with a certain sharp instrument, the exact nature of which is unknown.

On the 3d day of January, 1921, the defendant was put upon his trial, which resulted in a disagreement of the jury, and a mistrial was ordered by the court.   On the 26th day of January, the defendant was again put upon his trial.   The jury returned their verdict on the 28th day of January, 1921, with the result above stated.

The errors assigned are as follows:

That the verdict is contrary to law, and to the evidence; that the punishment assessed by the verdict and judgment is excessive, and was prompted by prejudice and passion, and was unwarranted by the law and the evidence.

The evidence shows that C. L. Harkins, the deceased, and the defendant, Charley Walker, were both convicts.   The killing occurred at the prison brick plant, which is located not far from the penitentiary.

The defendant, a negro, was screening sand.   He went to the toolhouse and asked for and received a hammer.   He then went into a stock car standing in the brickyard.   The deceased came along a runway that passed through the car pushing a

wheelbarrow, and the affray which resulted in his death start-- ed in the car.

W. C. Tidwell testified:

"I went over the runway through the car to get some lumber, about 3 o'clock. The defendant was sitting on some brick in the end of the car. I got some lumber and came back through the runway, and he was still sitting there. I threw the lumber down where I was building another runway. I heard a noise and saw some brick fall. I turned and the defendant had Doc Harkins around the neck and shoulders and Doc was dragging him towards me. Then I heard two shots in quick succession and the defendant turned Doc loose. As he passed me he had a knife in his hand, and was trying to put it up his sleeve. I did not see them when they first came out of the car."

Cross-examined, he stated that he had served several terms in the penitentiary, one for highway robbery, one for horse stealing, two for burglary, one for bank robbery, and one for assault with intent to kill, and is now serving a term for manslaughter.

J. B. McCullough testified:

"I am an inmate of the Oklahoma state prison. I take care of the tools at the brick plant. I saw the defendant standing by a pile of brick and he went into this car. Doc Harkins came along pushing a wheelbarrow along the runway through this car. The defendant motioned to him, and he set the wheelbarrow down and went back to where the defendant was. When he got back there he threw up his left hand. The defendant struck at him with something; I do not know what it was. It was a stock car, and I saw them through the slatting. I could not see which one struck first. Doc was between me and the defendant. Doc wheeled around and the defendant came out with him, holding him by the back of the neck somewhere. They came down the runway and ran against a pile of brick. Doc caught the defendant's arm and told him not to kill him, the defendant said, 'Turn my arm loose.' They scuff-

led a little bit and he turned Doc loose. They were coming towards me, and the defendant stabbed Doc twice right over the heart. He staggered over towards the kiln. Just then Mr. Williams fired a shot. They were about 17 feet from where I was standing when the gun fired. I heard Doc say: 'Don't kill me. I will give it to you, Charley. Don't murder me.' I ran and got Mr. Mayfield. Doc had walked about 40 feet from where I left them. Mr. Mayfield asked Doc if he was hurt. Doc said: 'I am killed. Charley did it.' He only lived three or four minutes."

J. L. Williams testified:

"I am a guard in the penitentiary. I was in the Northwest tower at the brick plant that afternoon and saw the defendant enter the car. In a few minutes Harkins entered the car. The scuffle started in the car, and I saw the defendant come out with his arm around Harkins' neck, stabbing at him. Harkins was hollering, and I took a couple of shots at the defendant."

Joe Jackson testified:

"I am serving a term for forgery. That evening, after Doc Harkins was killed, the defendant was put in a cell. I asked him, 'Did you kill him?' and his reply was; 'He won't try to bully anybody else any more,' and I asked him then what was the trouble. He said that he had won $1.85 off Doc Harkins and cashed out, and that Doc would not pay him but one dollar, and he told Doc, 'If you do not pay me the 85 cents you won't play any more poker in this world.' "

On cross-examination he stated that he had also served a a term in the Kansas penitentiary.

Wyatt Peavy testified:

"I am serving a term for highway robbery. I was present when this knife was found at the brick plant. It was stuck in the ground. Calloway Miller picked it up and threw it over the fence. I saw the defendant have this knife about three weeks before the killing."

The foregoing is the material testimony upon which the verdict and judgment were based.

As a witness in his own behalf the defendant testified:

"My age is 25. I was born in Oklahoma City, on California street, right back of the Baptist church. My mother died in 1905. After that I lived there with my grandmother. I was about 15 years old when I was first sent to prison at McAlester. My time was short. When I got out, I went to El Reno, and in two or three months I was back again for burglary. I stayed at McAlester about a year. Then I was transferred to Granite. There I had a fight and was convicted for assault with intent to kill and got eight years for it. I was sent to McAlester and I am serving the term. I played poker in Doc Harkins' game, and I won and cashed out one day after dinner. He payed me some but would not pay me the rest. I was screening sand to put on the brick, and I broke my screen. I came back with this hammer that I got from Cap. McCullough. I got a piece of wood to fix the screen. I stopped in the car and knocked the heels off my shoes. I was bending the tacks back when Doc Harkins came in and set his wheelbarrow down. He asked me what was that crack I had been making about him. I told him, 'Nothing.' He said, 'You need not think because you are in here for cutting one man you have got me bluffed,' and I said, 'I am in here for cutting a man, and you are here for raping a 14 year old girl, and I never done anything like that.' Then he made for me and struck at me with this knife, and I hit at him with the hammer and the handle came off. I grabbed him and scuffled with him two or three minutes and got that knife away from him and tried to defend myself. We fought each other coming out of this car. They said I done all the fighting, but he hit me and hurt me the same as he was hurt. We fought out on the runway there, and Mr. Williams shot, so I went around the kiln. Mr. Mayfield came, and I was put in solitary. The knife they say I done the killing with was not the knife. I stuck the knife down by a piece of steel that holds up the fan. In my other trial one day at noon they asked me if I could get the knife that I done the fighting with, and I told them, 'Yes,'

and Mr. Jedlicka, assistant warden, took me over there and I got it.''

The rule repeatedly announced by this court is that it has no power to reverse a judgment of conviction upon the ground that the verdict is not sustained by the evidence, unless there is no substantial evidence tending to show the guilt of the defendant, or the evidence fails so far to support the verdict that the necessary inference is that the jury must have acted from partiality, passion, or prejudice.

It follows that this court will not weigh the sufficiency of the evidence to sustain the conviction, but will consider all the evidence to ascertain whether a conviction is founded on substantial evidence.

The defendant contends that the evidence is insufficient to show a premeditated design or intention to kill.

The rule is well settled that if from all the facts and circumstances attending the killing the jury can reasonably and satisfactorily infer the existence of the premeditated design or intention to kill, they will be warranted in so doing.

One who intentionally uses upon the body of another, at some vital part, a deadly weapon, will in the absence of qualifying facts be presumed to intend the death, which is the probable and ordinary consequence of such act.

The charge of the court submitted the issues of murder, manslaughter in the first degree, and of self-defense, and fully and fairly covered the law of the case.

Upon the testimony of the defendant and the witnesses for the state the jury could have acquitted, or could have found him guilty of manslaughter in the first degree; but it was their exclusive province to pass upon and decide the credibility and weight to be given to their testimony.

Considering the character of the wounds and the other facts in the case, we are of opinion that the evidence was sufficient to sustain the conviction for murder.

The serious question presented by the record in this case is the sufficiency of the evidence to justify the infliction of the death penalty. In a prosecution for murder, the law of our state in its great humanity allows the jury, after they have first determined the question of guilt, to assess the punishment, which may be death or imprisonment for life at their discretion (section 2319, Rev. Laws), and even after the jury say that the defendant should suffer death, this court, in furtherance of justice, has the power to modify the judgment to imprisonment for life (section 6003, Rev. Laws). Fritz v. State, 8 Okla. Cr. 342, 128 Pac. 170. On the appeal from a capital conviction, the duty devolves on this court to examine with the greatest of care the whole record in favor of life, and review the case upon the merits to determine whether justice requires a modification of the judgment to imprisonment for life. Wilson v. State, 17 Okla. Cr. 47, 183 Pac. 613; Chambers v. State, 16 Okla. Cr. 238, 182 Pac. 714; Owen v. State, 13 Okla. Cr. 195, 163 Pac. 548.

Carefully considering the whole testimony in this case, we are unwilling to lend the sanction of our approval to the infliction of the death penalty, because in our opinion the testimony is insufficient to justify the extreme penalty of the law, and for this reason we think the jury abused its discretion in assessing the death penalty. While the evidence for the state tends to show that the killing was deliberate, the undisputed facts are that the killing occurred in a fight over a gambling game. The records of this court show that the deceased was a vicious and desperate criminal. See Ex parte C. L. Harkins, 7 Okla. Cr. 464, 124 Pac. 931, C. L. Harkins v. State, 14 Okla. Cr. 440, 172 Pac. 469.

In State v. Young, 19 Okla. Cr. 363, 200 Pac. 260, it is said:

"This was not a lying in wait assassination, or a homicide committed in the commission of a felony. The dispute arose over wages due from the deceased, a white man, to the defendant, a negro. Both were armed, and the negro killed the white man. The prejudices that are engendered in cases of this kind among our race is a matter of common knowledge, and this may have influenced the jury to assess the extreme penalty. A capital conviction should be above suspicion of any partiality, passion, or prejudice."

Our conclusion is that the punishment assessed by the jury is excessive and that justice requires a modification of the judgment and sentence of death to that of imprisonment in the penitentiary for life at hard labor.

The judgment of the district court of Pittsburg county herein is so modified; as thus modified, the judgment is affirmed.

MATSON and BESSEY, JJ., concur.