## C. C. CHAMBERS v. STATE.

No. A-3418—Opinion Filed July 26, 1919.

(182 Pac. 714.)

1. **HOMICIDE—Degree—Intoxication—Evidence.** On a trial for murder, evidence of intoxication is admissible, not to excuse the crime charged, but as a circumstance tending to show that the killing was not the deliberate and premeditated act of the defendant, and a state of intoxication which will reduce homicide from murder to manslaughter in the first degree must be of such character and extent as to render the defendant incapable of entertaining or forming a design to effect death.

2. **SAME.** Where the premeditated design or intent to kill exists, and the killing was unprovoked by any cause adequate to reduce the degree of the crime to manslaughter, the intoxication of the defendant at the time of the act cannot affect the degree of the crime.

3. **SAME—"Voluntary Intoxication."** Where it appears that defendant was intoxicated at the time the killing was done, the intoxication was "voluntary" within the meaning of the law, although the liquor was furnished defendant by the person killed.

4. **APPEAL AND ERROR—Reduction of Sentence.** Under Code of Criminal Procedure (section 6003, Rev. Laws 1910), this court, in the furtherance of justice, has the power to modify any judgment appealed from by reducing the sentence.

5. **SAME—Homicide—Evidence—Modification of Sentence.** The evidence reviewed, and held sufficient to warrant a verdict convicting defendant of murder, but insufficient under the facts and circumstances of the case to support a verdict assessing the death penalty, and the judgment and sentence is modified to imprisonment for life at hard labor.

*Appeal from District Court, Okfuskee County;*

*Geo. C. Crump, Judge.*

C. C. Chambers was convicted of murder, and he appeals. Modified and affirmed.

*Wm. S. Peters,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

DOYLE, P. J. This is an appeal by C. C. Chambers from a conviction of murder and judgment and sentence of death. The information charged that C. C. Chambers did, in Okfuskee county, on or about the 22d day of April, 1918, kill and murder one S. M. Wilson, by shooting him with a pistol. In accordance with the verdict of the jury, he was sentenced to suffer the punishment of death by electrocution as provided by law. When the appeal was perfected, an order was entered and served on the warden of the penitentiary, staying execution of the sentence pending decision of the appeal.

The errors assigned are:

That the court erred in overruling the defendant's motion for a new trial.

That the evidence is insufficient to support the verdict assessing the extreme penalty of the law, because the punishment is excessive and unreasonable, and said verdict is the result of prejudice and bias against the defendant and is not based upon the law and the evidence.

It appears that the deceased, S. M. Wilson, left Okemah in an automobile with two Indians, Jonah Bear and Joe Caney, and in driving through the town of Castle met defendant. The deceased asked defendant to get into the car and go with them, and they drove to the town of Boley, then went several miles west of Boley, looking for witnesses in a lawsuit, and returned to Boley between 4 and 5 o'clock that afternoon. The deceased had served four years as sheriff of Okfuskee county, during which time defendant, a negro, was his deputy. They were good friends. They had both been drinking during the day. The deceased furnished the whisky and both became somewhat intoxicated. That night between 9 and 10 o'clock they had a scuffle in

the automobile, and defendant shot the deceased, killing him instantly.

The evidence in the case was substantially as follows:

Jonah Bear testified:

"I live five miles west of Okemah and knew Sam Wilson for a long time. I understand only a few words of English. When we started there were three of us, I, Sam Wilson, and Joe Caney. At Castle, Chess Chambers got in with us, and from there we went to Boley, then out in the country, and back to Boley. We were drinking. Sam Wilson furnished the whisky. He gave Chambers a bottle. Between 9 and 10 o'clock we started to go home. I got in the car first. Sam Wilson and Chess Chambers got in the front, and Sam told Chess two or three times to get out, and Chess said he would not get out, and Sam just pushed him out, tried to push him out, you know, and Chambers pulled out a six-shooter and shot him; that was all there was to it. When I saw him pull the six-shooter, I started to grab it. I was directly behind Sam, so I could not reach it, and he shot him. Joe Caney was outside of the car on the ground. Sam did not have a gun, only just tried to push him out, was all. I hadn't taken but three drinks while we were in Boley. Sam gave me the drinks."

Joe Caney testified:

That Sam Wilson came to his place a little before noon. Jonah Bear was with him. "I went with them to the other side of Boley, between Okemah and Boley. At Castle, Chess Chambers got in the car. When we got to Boley, we stopped about 20 minutes and then went on west to Jimmie Huchinula, looking for witnesses in the Ponsey case, now pending in this court. A little after 4 o'clock we returned to Boley. I was right in front of the car when Sam Wilson was shot. Defendant was on the front seat on the right side of Sam Wilson. Sam told him to get out and get in the back seat; that he wanted Joe to sit by him. That is what he said. Chambers made a whole lot of talk.

I saw Chambers get a gun out and shoot Sam. The car was Sam Wilson's. Jonah Bear was in the car." That he was a Creek full-blood and did not drink whisky. That they had been gone from the car about three hours, and when they returned they could not walk good. That he did not think he could drive the car.

John Owens testified:

"I live at Boley. I am city marshal. When Chambers shot Sam Wilson, I was sitting on the sidewalk in front of the Masonic Temple, and the car was just across the street and a little angling to the north. The first thing that attracted my attention was some men tussling in the car. It was just dusk. I started to get up and go over there, and about the time I started a gun fired. I ran and jumped in the front end of the car and found a man with his head down. I raised him up and recognized Sam Wilson. I asked, 'Who killed him?' Chambers was sitting right by him with a pistol in his hand, and he said, 'I killed him.' I took hold of the gun and wrenched it from his hand. Several others were there. Ed Graddy, Reuben Tyler, H. C. Cavill, and others; I can't name them all. Two Indians were there. One, Jonah Bear; the other I did not know. Chambers seemed to be drinking. I asked some one to call a doctor. Chambers at the time was deputy sheriff."

H. C. Cavill testified:

"That he stepped out of Spencer's store four or five steps from where the shooting occurred, and saw Jonah Bear standing up in the back end of the car; Wilson and Chambers were sitting with their faces together in the front seat, Mr. Wilson saying, 'Get out,' and just then the gun fired."

Dock Barnett testified:

That he was standing about 10 or 12 steps from the car when the gun was fired, and heard Sam Wilson tell Chambers to get in the back seat and let one of the Indians get in the front seat with him, and Chambers told him he

did not ride in no damn man's back seat, and then the gun fired.

Dr. W. A. Paxton testified:

He had been a practicing physician at Boley for ten years, and was called and found Mr. Wilson sitting in a drooped position in the car where the chauffeur sits, saw that he was shot, and found he was dead. The wound was in the breast, through the upper portion of the heart, and death was instantaneous.

Dr. C. M. Bloss testified:

That he was a practicing physician at Okemah, was called to examine the body of Sam Wilson; and found it in the seat of his car, which was standing in the streets of Boley, and found a gunshot wound in the breast just beneath the sternum, and the skin was powder burnt.

For the defense, Wm. S. Peters testified:

"I have lived at Boley for seven or eight years, practicing law. I knew Mr. Wilson and defendant Chambers during that time. I saw them two different times that evening. When I left the office for the evening, they were on the other side of the street and called me over and began to talk to me. From their appearance I did not want to talk with them, and I got away from them as quickly as I could conveniently. About an hour later I started home and came in contact with them again on the street, and they began to talk to me again. Something was said about Bradley. They discussed two different subjects with me, and one would say to the other, 'You can't tell it,' and one would say, 'Let me tell him,' and Mr. Wilson pushed Chess back, and he would try to talk to me, and Chess would push him back and say let him tell me. The last time I was leaving them, I had walked about five or six steps, when I heard Chess say: 'You let my gun alone. You don't know what you are doing. You can't shoot the gun.' I was four or five blocks away when the shooting took place."

C. P. Young testified:

"I know Mr. Wilson, and I have known .Chambers about 45 years. About ten minutes prior to the killing, I had a conversation with them. They were both so drunk they could hardly walk. While they were talking the Indian, Jonah Bear, came up. Mr. Wilson asked him if he would carry him home. He thought he was not in position to carry himself, that he could not drive good, and he asked Jonah Bear if he could drive the car, and Jonah said, 'No,' and shook his head. Mr. Wilson made the remark, 'There is Jonah Bear, the best damn fellow in this country,' and Chambers spoke up and said, 'He ain't no better than me, is he?' and Wilson said: 'No, he ain't no better than you. I am as good a friend as you got in the country.' Chambers could beat Mr. Wilson standing up."

Witness Green testified that Dr. Bloss picked a watch up in the automobile and gave it to him; that the watch belonged to Chambers' wife.

As a witness in his own behalf, the defendant testified:

"My name is Chess Chambers; I am 53 years old. Have lived at Boley 12 years. I have been deputy marshal, constable, and deputy sheriff since I have been there. Mr. Wilson was sheriff of Okfuskee county for four years, and I was his deputy sheriff at Boley during that time. Between 2 and 3 o'clock that day he asked me at Castle to get in the car and ride with him. We went to Boley, and then went four and one-half miles west of Boley. These Indians were in the car. We got back to Boley between 4 and 5 o'clock I had never had a cross word with Mr. Wilson in my life. We left the car in the street and walked around the town drinking for two or three hours. Mr. Wilson bought the whisky. He went to Turner's and asked about the ballot box and came back to Jones' store, and Jones was not there. He then went to Turner and told him he only had a few days to get busy or there would be some-

lady up there who wouldn't let us register, and we couldn't get to vote, and he says that Woods and O. H. Bradley gets a stand-in with them Democrats and there would be somebody up there that would not let you negroes register down here, and said: 'The next time I come to Okemah, I am going to run him out of town. You negroes ought to run him out.' Then he went back to Jones' place, and Jones was not there, and we started up the street. He began to talk about Bradley again, and he said: 'Give me that pistol. I will get in the car and go up there and run that negro away this evening.' And I said: 'No, Mr. Wilson, don't do that. Don't get into trouble.' My pistol was in my hip pocket, and I moved it around on the other side, and he ran his hand around, and I moved it around this way. We were on the street then. He had a pint of whisky, and we finished drinking that. Then he asked Turner, 'What have you got back there?' and Turner said, 'Might have a little alcohol,' and he said, 'You want some alcohol, Chess?' I said: 'I don't care, I might drink a little.' So he drank some alcohol, and I drank a little. Mr. Wilson first got a pint, and me and him and the Indian drank that up. Then he got some more. I don't know where he got it. I drank every time he did. We were both drunk. When I got in the car, he said, 'I wish you would get in the back seat with that Indian,' and he says: 'You didn't do what I told you. You know what I told you about Bradley; Bradley and Hurst both ought to be yoked together and drove out of the country.' And I said, 'Mr. Wilson, I ain't going to get out of the car and let you do that.' About that time he shoved me, and I put my hand on the car to keep from falling out; and one of the Indians was sitting behind in the car. I knew Jonah, and the other one, I didn't know what his name is, he was out, and Jonah was in the seat behind and grabbed me by the collar. Jonah jumps up and tries to get me loose from Mr. Wilson, and Mr. Wilson started to get the pistol I had, and when he struck the pistol handle I reached in and moved it around. I got it out of my pocket and started to

put it in my other pocket, and in the scuffle pulled the pistol off. I was carrying a watch at the time. Afterwards Mr. Green told me that Dr. Bloss was up there and found it about the car. I did not shoot Mr. Wilson intentionally. I would not shoot him for nothing. I would shoot my brother as quick as I would shoot Mr. Wilson."

### Cross-Examination.

"Q. You say you don't remember when you lost your watch? A. No, sir; I didn't know when I lost it. I know when I got out of the car I didn't have it. I know when I got in the car I had it; when I got out of the car I didn't have it. Q. Now, you say you were pretty drunk that day? A. I was. Q. And you were sober enough to know what was happening, wasn't you? A. Until I got drunk, I was. Q. You knew you had a gun in your hand when you shot Sam Wilson, didn't you, A. I knew the gun in my hand went off. Q. You were not so drunk but what you knew when you shot him? A. Well, he struck it around here; he struck the handle of it and tried to get my gun. Q. Now, as a matter of fact, do you say this was an accident? A. That is all I could say, an accident. Q. What kind of a pistol was that? A. A single action six-shooter Colt's. By the Court: Did Mr. Wilson have hold of the gun, Chess? A. I don't think that he did. Q. Who cocked it? A. I don't know, sir; in the scuffle the gun cocked and went off."

The instructions given submitted the issue of murder on the theory of the state that the killing was done deliberately, and justification on the theory of the defense that it was a case of accidental shooting, for which defendant was not criminally responsible.

Counsel for plaintiff in error did not represent him upon the trial. In his brief he does not ask for a reversal of the judgment, but insists that the evidence is insufficient to warrant the extreme penalty, and that the judg-

ment and sentence should accordingly be modified by this court.

The Attorney General's brief concludes as follows:

"We say that under our statutes this was a murder; and, while our laws do not draw the distinction as is done in other states between murder in the first and second degrees, it does go very far towards drawing a distinction between different degrees of murder in fixing the penalty —it may be life imprisonment or it may be death. We think that this man should have a life sentence in the penitentiary, instead of a death sentence. We dislike very much to dissent from the decision of an honest jury, and there is nothing in this record that shows that they were not an honest jury; but, on a fair and complete reading of this record, we are forced to suggest to this court that it has the power to modify this judgment under section 6003, Rev. Laws, and we ask that the same be done."

After a careful consideration of the testimony, we think it is technically sufficient to sustain the conviction. The crime was undoubtedly committed, like many others, under the influence of intoxicating liquor, but for which the fatal shot would not have been fired. However, the fact that defendant was somewhat intoxicated furnishes him no excuse.

Our Penal Code provides:

"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition." Section 2095, Rev. Laws 1910.

Under our Penal Code, first subdivision, section 2313, Rev. Laws 1910:

Homicide is murder: "When perpetrated without authority of law and with a premeditated design to effect

the death of the person killed, or of any other human being."

And evidence of intoxication is admissible to show an absence of the premeditated design to kill, for the purpose of determining whether the offense was murder or manslaughter, and a state of intoxication which will reduce homicide from murder to manslaughter in the first degree must be of such a character and extent as to render the defendant incapable of entertaining or forming a design to effect death, and the question is for the jury to determine. *Cheadle v. State,* 11 Okla. Cr. 566, 149 Pac. 919, L. R. A. 1915E, 1031.

Where the premeditated design or intent to kill exists and the killing was unprovoked by any cause adequate to reduce the degree of the crime to manslaughter in the first degree, the intoxication of the defendant at the time of the act cannot affect the degree of the crime.

If defendant was sober enough to form the design to kill and to deliberate and premeditate this crime, then his responsibility is the same as if he had been perfectly sober, and his intoxication was voluntary within the meaning of the law, although the liquor was furnished defendant by the deceased.

The record shows that counsel for defendant did not request instructions as to the law of manslaughter in the first degree; yet we think that, upon the uncontroverted facts and circumstances in evidence and the testimony of defendant, the court should have instructed the jury on the subject. If defendant's counsel had requested such instructions, and they had been refused and exceptions taken, the question would have been properly raised.

In a prosecution for murder, it is the duty of the trial court to instruct on the law of manslaughter if there is

any evidence that the alleged crime might have been done under circumstances that would reduce the crime from murder to manslaughter; however, it is not reversible error for the trial court to omit to instruct upon some particular branch of the case under the defendant's theory of the case, when the defendant has not requested such instructions. *Williams v. State,* 12 Okla. Cr. 39, 151 Pac. 900.

But we think it is a proper matter for consideration upon the question as to whether the judgment should be modified.

In a capital case, the law of our state in its great humanity allows the jury, after they have first determined the question of guilt, to assess the punishment, which may be death or imprisonment for life at their discretion, and, even after the jury say that the defendant should suffer death, this court, in furtherance of justice, has the power to modify the judgment to imprisonment for life. Section 6003, Rev. Laws 1910.

In the case of *Fritz v. State,* 8 Okla. Cr. 342, 128 Pac. 170, it is said:

"The power of this court to modify a judgment inflicting the death penalty for murder to imprisonment for life at hard labor, when deemed proper in the furtherance of justice, is in no sense the power of commutation of the sentence of the lower court. Commutation can be granted only by the chief executive of the state, and is granted as a matter of clemency. The judicial power to modify a judgment and sentence and the executive power to pardon, parole, or commute are wholly distinct in their nature. The one is an award of justice, and the other is an act of grace. Commutation is a matter of discretion, and may be refused. Justice is imperative, and must not be denied. The fact that the Governor has the power to commute does not abridge the defendant's right to appeal to this court for

relief. In other words, the provision of our criminal procedure act makes it the duty of this court to review the record, and in a proper case, if necessary in the furtherance of justice, modify the judgment so as to prevent the imposition of punishment which the evidence will not warrant."

In this case we are convinced from a careful examination of the record that the evidence is insufficient to warrant the extreme penalty of the law, and for this reason the jury abused its discretion in assessing the death penalty. While the evidence for the state tends to show that the killing was deliberate, the undisputed facts are that defendant and the deceased were at all times intimate and familiar with each other; there was no evidence of any animosity between them.

While defendant's intoxication is no excuse for the crime committed, it is a fact tending to throw light on other facts and circumstances in the case, and at most the evidence tending to show premeditated design to take life is very weak and unsatisfactory.

For the reasons stated, we are of opinion that the punishment imposed is excessive. It appearing from the record that no objections were made or exceptions taken in the case, to any ruling of the court, our duty is fully performed by modifying the judgment to the extent that the sentence will be changed from the infliction of the death penalty to that of imprisonment in the state penitentiary at hard labor for life.

As thus modified, the judgment herein is affirmed.

ARMSTRONG and MATSON, JJ., concur.