## JOSEPH HUBKA v. STATE.

No. A-6747.   Opinion Filed May 26, 1928.
(267 Pac. 864.)

David L. Carter, H. S. Braucht and McLaury &
Hopps, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson,
Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter
called the defendant, was by information filed in the dis-
trict court of Kay county, Okla., on September 30, 1926,
charged with the crime of murder by shooting Joe Novot-
ny. He was tried and found guilty, and his punishment

fixed by the jury at death by electrocution. Defendant has appealed from the judgment of conviction and sentence of death to this court.

The evidence introduced by the state is, in substance, that the deceased and the defendant were brothers-in-law, the deceased having married a sister of the defendant; that the Hubka family had lived for a number of years in Noble county, where they had homesteaded a quarter section of land, the place being the homestead in the name of Anna Hubka, the mother of the defendant; that the father, Joseph Hubka, Sr., died some time during the year of 1919; that shortly thereafter negotiations were conducted for the sale of the quarter section known as the homestead, and that defendant was negotiating with several parties for the sale of the land, and in 1920 the defendant approached Joe Novotny with a proposition for Novotny to buy the land; that in May, 1920, the deceased entered into a contract with Anna Hubka, in the presence of the defendant, for the purchase of the 160 acres, agreeing to pay $18,000 therefor, and on the 29th day of June, 1920, a deed was executed by Anna Hubka to the deceased, Joseph Novotny; that shortly thereafter Novotny took possession of the land and moved on the place; in 1921 oil was discovered upon the land, and the same became very valuable; that, when the oil was discovered, the defendant in this case began to complain that they should have received more money for the land than was agreed upon, and began to demand of the deceased that he pay to his family a sum of money, or divide the mineral rights with them; that in the interim during the time between the time oil was discovered on the land and the date of the homicide the defendant had been demanding of the deceased moneys for his family, and on more than one occasion had written letters to the deceased. On April 21, 1924, the defendant wrote the deceased a letter, which is in words and figures as follows:

"Oklahoma City, April-21-24.

"Joseph Novotny, Tonkawa, Oklahoma: About thirty days ago I wrote you stating certain facts up to this date I did not receive a word from you. I am not surprised at all because that is the way you have conducted yourself in the past. I have studied you from every angle. And this is the whole thing in a nut shell it is your motto day by day.

"I am doing well and let the others go to hell. I have said to them that they can do me as they like. But to you I say for the last time. That I have been tramped and stomped on all I care to be by you. And before I would have you do this any longer. I would rather see myself in hell. I enclose the five dollars you loaned me.

"I will give you just six days to write or call in person.      Joseph Hubka."

The defendant at the time of the homicide was making his home in Marland, Okla., and on September 22, 1926, he left his home and went to Tonkawa, where he met the deceased.

Edward Daniel, a witness on behalf of the state, testified: That his home was in Tonkawa. That on the morning of September 22, 1926, he was at the corner of Seventh and Tonkawa avenue; and about 10 o'clock that morning he saw Joseph Hubka. When I first saw the defendant, I was sitting in front of the Kruger building on the steps. I did not know the deceased during his lifetime. The defendant came running around the corner of the building and hollowed to another man. The other man looked around and he came up and hollowed, "Hey!" and the man looked around, and a shot was fired, and the man fell. I did not see anything in the hands of the man. The defendant was running as he passed me. The man that was killed was out in the street about the length of an automobile from the curb. He was walking around in front of one automobile and behind the other. I heard nothing said by the man that was killed; there wasn't a word uttered. The man who fired the shots was

about 8 feet, the best I can remember, from the man he shot. After he fired the shot, the man reeled and fell. Maybe I could have counted ten before he began to shoot again. I can't tell how many shots were fired; they were fired so fast. After he was through shooting, I jumped and ran right close to him and says: "My God, man, what have you done? You have murdered this man." Before that he had thrown his gun out on the pavement. I was about 24 feet, as near as I can tell, from the party that fired the shots.

Ralph Stone testified: That he was in Tonkawa on September 22, 1926. That he knew the deceased during his lifetime, and also knew the defendant when he saw him. I was standing on the corner of Grand avenue and Seventh Street, right west of the drug store. While standing there, I heard some gunshots, and saw Joe Novotny reeling right behind a car. Directly after that I saw another fellow come out from the east side of the car. After Novotny fell on his back, the defendant came around up to the side of him and shot him. I don't know how many shots; they were fired so rapidly, and I didn't realize what it was all about. After the shooting, the defendant took his gun and throwed it apparently at the deceased; I could not tell from where I was whether he hit the body of deceased. Defendant just stepped back and put his hands on his hips and stood there. All I heard him say was, "He would have done me the same way."

L. D. Eastman stated: That he lived in Tonkawa. That he knew Joe Novotny prior to his death; also knew the defendant. He was in Tonkawa the morning of September 22, 1926. When I heard the first shots, I was on the corner at Main and Seventh, right at corner of the drug store with Mr. Stone and Mr. Brown. After I heard the shots, I looked around and saw Mr. Novotny was just staggering back behind a car. Then, as Joseph Hubka followed him up, Novotny fell right behind the car, and Joseph stood

there and went to shooting. When the gun quit firing, he drew it up and looked to me like he drove it at his face. I did not see the gun any more after it struck the pavement.

Ralph E. Patterson testified to seeing the shooting and that he picked up the gun. Thelma Drennan and J. R. Milligan testified, in substance, to the same facts as the other witnesses.

The state then called Roy R. Carver, Sam Tulk, Mary Keating, and Emma Palmer, for the purpose of identifying and proving a statement made by the defendant at Ponca City the afternoon and evening of the alleged shooting, in which statement the defendant stated: Novotny was his brother-in-law, and that trouble had been existing between him an Novotny since 1920. That the difference arose between a $1,800 and $2,200 that was to be paid on the land. The deceased had threatened my life a number of times. He threatened it a week ago last Monday. That was about the 13th day of September, 1926. We was in Tonkawa at the time. There had been no words between us since the 13th of September, 1926, nor has he made any threat against me since that time, and I had made none against him. I left Marland the morning of September 22, 1926, about 6 or 6:30 o'clock. I had my gun with me. It was a .32 automatic. I have owned it for three or four years. I bought it in Oklahoma City. I brought it over there with the intention of killing Joe Novotny. I just decided to kill him this morning. I don't know whether I killed him or not, but I shot at him. When I threw the gun, I aimed to hit him in the face with it. He was about 10 feet from his car, northwest, when I shot him. I was about 25 feet from him when I shot first. Novotny was going toward his car, and I said to him, "Here is what you promised me, and I am going to beat you to it." He started to say something, but I did not understand what it was. I don't know whether Novotny had a gun on him that morn-

ing or not. This is, in substance, the testimony in behalf of the state.

The state, over the objection of the defendant, introduced in evidence a photograph of the body of the deceased, which photograph was taken after the body was removed from the scene of the trouble.

The defendant admitted that he killed Joe Novotny, but his defense was that, on September 22, 1926, at the time the killing occurred, the defendant was what is known as a paranoiac (that is, that he was suffering from delusionary insanity); that at the time he was mentally irresponsible. The defendant's evidence, both expert and non-expert testimony, tended to establish such a mental condition of the defendant as would render him irresponsible, incapable of comprehending the consequences of his acts.

Dr. George E. Niemann, called as a witness on behalf of the defendant, testified, in substance: That he was a physician and surgeon, and was chief of staff of surgeons in the Ponca City Hospital. That he had studied nerves and mental disorders for 24 years. That he had examined Joseph Hubka, who was in the courtroom at the time witness testified. That he had examined him on two different occasions. I examined him possibly a week or ten days after the killing of Joe Novotny, and I examined him since that time, and it is my opinion that the patient was suffering with paranoia or delusionary insanity.

Dr. C. E. Northcutt testified: That he was a physician and surgeon located at Ponca City. The last part of September, 1926, he visited the defendant. It was a few days after the homicide. He examined him eight or ten days before the trial; made an examination of defendant's mental condition. The examination continued for about an hour to an hour and a half. By his examination and patient giving a history of his personal complaints, and his action in making his complaint, and the evidence as he explained

these things to me, brought me to the conclusion in the diagnosis that the defendant was suffering from a mental disease. I found paranoia—paranoia (that is, mental sickness), as we are taught by our past experience and from literature by authorities on mental and nervous diseases. I found the defendant in a stage of delusions of persecutions. He had what we term "delusionary insanity."

A number of other witnesses testify as to the peculiar actions of the defendant, all tending to show a deranged mind. The state, in rebuttal on the question of insanity, called Dr. A. L. Hazen and Dr. H. O. Gowey, who testified, in substance, that the defendant's action did not show him to be insane, and a number of nonexpert witnesses were also called, who testified that in their opinion the defendant was sane.

The testimony in this case on the question of the sanity of the defendant, both expert and nonexpert, is conflicting—the witnesses for the defendant stating that the action and conduct of the defendant was such as to cause them to believe that the defendant was insane; the witnesses for the state testifying that they noticed no action of the defendant indicating insanity, and that they believed him to be sane. There is no conflict in the evidence as to the facts and circumstances of the homicide. The evidence in this case is voluminous, covering more than one thousand pages of record, and it would serve no useful purpose to set out at length all of the objections urged by the defendant as to the errors committed by the court in the admission of testimony and in the instructions.

The defendant, after the conviction, and upon a motion in arrest of judgment, introduced testimony to show that the defendant at the time of hearing the motion was insane, and that the sentence should not be imposed upon him. Expert and nonexpert testimony in support of the motion in arrest of judgment was introduced, and the court found that it did not disclose sufficient facts and conditions

to warrant him in calling a jury to determine the mental condition of the defendant at the time the motion in arrest of judgment was being considered, and overruled the motion in arrest of judgment.

The defendant urges as one of his assignments of error that the introduction of the photograph of the body of the deceased was prejudicial to his rights. Under the evidence in this case, it was not necessary that this photograph should be introduced, and this court is not inclined to say what effect this photograph, in view of the testimony of the eyewitnesses, had upon the jury. It may have been the means of causing the jury to assess the maximum penalty, but in the view we take of this record we do not deem it necessary to further discuss that question, as the testimony is amply sufficient to sustain the conviction of murder.

The question of sanity or insanity at best presents a question of fact for the jury, and, when the jury has settled that question without passion or prejudice in accordance with the evidence, it is not within the province of this court to disturb the verdict of the jury.

After a careful consideration of this case, and the facts and circumstances surrounding the parties at the time of the homicide, there seems to have been a real or imaginary feeling of the defendant that the deceased had done him and his family a grievous wrong, and the evidence tends to show that the defendant believed the deceased intended to remove him and get him out of the way, that this belief, real or imaginary, so weighed on the mind of the defendant until he armed himself with his gun and sought out the deceased and fired the shots that took the life of the deceased. Under the evidence and the law as given the jury in this case, the jury could not have done other than return a verdict of guilty of murder, if they reached a conclusion that the defendant was sane at the time he fired the shots. We are not unmindful that this is an important

case, and we have given it that careful study which its importance requires, and a most careful examination revealed nothing in the record that gives us a right to hold that the interest of justice requires a new trial. One of the grounds of the motion for a new trial, and assigned as error, is that the verdict of the jury is cruel and unusual punishment, and not supported by the law or competent evidence.

It is urged that the jury abused its discretion in assessing the death penalty, and that the judgment and sentence should be modified to imprisonment for life. Counsel for both state and the defendant have briefed the question of excessive punishment; the defendant urging a modification of the judgment and sentence, and the prosecution objecting to it.

In a capital case, the law of our state allows the jury, after it has determined the question of guilt, to assess the punishment, which may be death or imprisonment for life, at its discretion. Section 1739, C. O. S. 1921; and, after the jury has returned a verdict saying the defendant shall suffer death, this court, in furtherance of justice, has the power to modify the judgment to life at hard labor. Section 2820, C. O. S. 1921; Owen v. State, 13 Okla. Cr. 195, 163 P. 548; Chambers v. State, 16 Okla. Cr. 238, 182 P. 714; Wilson v. State, 17 Okla. Cr. 47, 183 P. 613.

The duty imposed upon the court of protecting the taking of human life is a grave and solemn one; to take the life of a human being, even when taken by the law, is a trying and grievous task. Considering the whole testimony in this case, we feel constrained to say that we find few palliating circumstances in behalf of the defendant. From the statement of the defendant introduced by the state, it appears that the deceased had threatened to kill defendant or to injure him, and that considerable animosity and enmity existed between the parties with reference to the purchase of a farm of the mother of defendant. In this

respect the actions of the defendant differ from murder committed in the perpetration of another crime.

Taking all the facts into consideration and the enmity and feeling that seems to have existed between them, we are of the opinion that the punishment imposed is excessive, and that justice requires a modification of the judgment and sentence of death to that of imprisonment at hard labor in the state penitentiary for life, and, as so modified, the judgment herein is affirmed.

DOYLE, P. J., and EDWARDS, J., concur.