LAWRENCE MITCHELL v. STATE.

No. A-9011. Aug. 7, 1936.
(60 Pac. [2d] 631.)

P. A. Chappelle and Amos T. Hall, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for the State.

DAVENPORT, J. Appellant, Lawrence Mitchell, was indicted, charged with the murder of James Williams. Upon a trial had, the jury found Lawrence Mitchell guilty of murder and fixed his punishment at death. Motion for new trial was duly filed and overruled, and in pursuance of the verdict of the jury he was sentenced to suffer death by electrocution as provided by law. The plaintiff in error in this opinion will be referred to as the defendant.

The testimony on behalf of the state shows the defendant Lawrence Mitchell and the deceased, James Williams, and Ernest Leslie were in a car together; Leslie stated the deceased and defendant had been arguing and quarreling over 25 cents the defendant owed the deceased. He further states they drove to 316½ Frankfort place.

"I was driving, we parked the car and I sat in the car about a minute and they continued to argue, the defendant finally told the deceased, 'I know I owe you a quarter, there ain't but one thing for you to do, get out and take two bits worth on me.'"

The witness refers to the parties as Bill, the deceased, and the defendant as Hatchett. Bill said: "No, there is no need of that, you can pay me my quarter." The defendant got out of the car first, and the deceased shortly thereafter.

"While the defendant was standing by the car he started talking to Tommie Kelly and two more boys; the deceased started into the house; the deceased was in front of me; I heard some one say, look out, and just as I looked around Hatchett hit Bill, the deceased, over my shoulder, and deceased broke and ran into the house. He finally came out and asked me to do something for him, and I took him to the hospital on Pine and Greenwood Place."

Other witnesses, testifying for the state, in substance gave the same testimony as did the witness Ernest Leslie.

At the close of the state's testimony, the defendant moved the court to acquit and discharge the defendant for the reason and upon the ground that the evidence is wholly insufficient to sustain and support the allegations in the indictment; which motion was overruled, and the defendant saved an exception.

Lawrence Mitchell, testifying in his own behalf, in substance stated:

"I knew James Williams in his lifetime; I know Ernest Leslie and Clarence Hairway: have known Clarence Hairway three or four years; I had trouble with the deceased on the 24th of April, 1935; deceased and I had a little friendly argument about two or three days before the killing occurred; he argued with me and attempted to cut me several times; the argument was about a quarter I borrowed from him; we had two or three arguments about the quarter; on the day of the homicide we came down to Mrs. Hughes, 316½ Frankfort Place; we left there together in Rue Washington's car; we were not drinking; we went to the Small Hotel, and were there about four or five minutes and returned to the place we had previously left; we stopped the car and deceased and I got out on the same side of the car, I got out first and Williams followed me; Ernest Leslie got out on the left side of the car. I was standing by the car talking to Tom Kelly; I said to Ernest Leslie, 'I have a dollar, so if you

have a dime we can go to the ball game,' and Bill said, 'You got a dollar, why don't you pay me my quarter?' and I says, 'I can't give it to you today, Bill, I will give it to you tomorrow when I come'; Bill says, 'You are going to pay me now'; I told him I could not pay him until tomorrow when I come to town. 'You are going to pay me or pay Jackson one,' and I replied, 'You don't feel that way, do you?' and he spoke and said, 'Hell, yes, that is the way I feel about it,' and we started walking back and I called to him and says, 'Do you mean that sure enough?" and he says, 'Yes, I mean it'; he whirled and got his knife, and I jumped back and got my knife and cut him; he did not say anything, just whirled and run. Ernest Leslie had just stepped up on the curb at the time.

"I heard Clarence Hairway testified that when I got out of the car I slammed the door. I was not the last one out. I did not see Clarence Hairway sitting in front of his business. The deceased had a little jar under his left arm when I cut him; I cut him only once; I turned around and he turned from me. I cut him because I was afraid. I would not have cut him for anything in the world, God knows I wouldn't, but I was afraid of him. I did not tell witness Lynch when I was arrested that I had killed the deceased, and that I was going to kill another one. I did not say anything like that."

The foregoing is in substance the testimony of the state and the defendant.

The defendant, in his motion for a new trial and his first assignment of error, raises the following question:

"That the plaintiff in error did not have such a fair and impartial trial as is provided for and guaranteed by the Constitution of Oklahoma and the United States, in that the defendant is a negro, and members of his race, though qualified to serve as jurors in the trial court have been systematically excluded from the jury."

The record discloses that when the case was called for trial both sides announced ready; a jury was called

and examined, and the state waived its peremptory challenges, and the defendant exercised two of his; that the trial was had and a verdict of guilty returned by the jury imposing the death penalty; and for the first time the defendant in his motion for a new trial raises the question that negroes were excluded systematically from the panel in the county of Tulsa.

The defendant in his argument insists that the officers of Tulsa county knowingly discriminated against the African or negro race solely on the ground of their race and color, and had denied them the privilege accorded white citizens of participating as jurors in the administration of justice, and that by so doing they violated the Constitution of the United States and of the state of Oklahoma. The Fourteenth Amendment to the Constitution of the United States in part provides as follows:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Constitution of the State of Oklahoma (article 1, § 1) declares that:

"The Constitution of the United States is the supreme law of the land."

The defendant urges that negroes were excluded from jury service in the county of Tulsa solely and only on the ground of their race and color, and that by so doing they were discriminated against and deprived him of his constitutional right, and that he did not have due process of law, citing in support of his contention: Strauder v. State of West Virginia, 100 U. S. 303, 25 L. Ed. 664; Gib-

son v. Mississippi, 162 U. S. 565, 16 S. Ct. 904, 40 L. Ed. 1075; Carter v. Texas, 177 U. S. 442, 20 S. Ct. 687, 44 L. Ed. 839; Norris v. State of Alabama, 294 U. S. 587, 600, 55 S. Ct. 579, 79 L. Ed. 1074.

The foregoing cases cited by the defendant have been carefully read and studied by this court, and in all of these cases the question as to whether or not negroes have been systematically and solely excluded in the county where the case is being tried was raised by plea in abatement, or by motion to quash the panel of the jurors based upon that ground, and the motion was filed before the case was called for trial or a jury impaneled. The authorities cited by the defendant are not in point, the facts in this case being different from the facts in the cases cited. In each of the cases cited the question was raised by the defend- ants before the case was called for trial and the jury im- paneled. As stated herein, when this case was called for trial, so far as the record shows, the jury called to try the defendant was entirely satisfactory and the requisite number of jurors were selected and accepted by both the state and the defendant, after the defendant had exer- cised only two of his peremptory challenges, and the ques- tion urged by the defendant is that he did not have due process of law, for the reason that members of the Afri- can or negro race were excluded systematically and solely from the jury panel from the county of Tulsa because of their race, color, and previous condition of servitude, and by reason of that fact he did not have a fair and impar- tial trial.

The courts are uniform in holding that where an eli- gible class of persons are excluded from the petit jury panel a challenge to the panel is the proper remedy of one whose interests are affected. In State v. Banner, 149 N. C. 519, 63 S. E. 84, this court said:

"A challenge to the array after plea of not guilty is too late."

"A party cannot thus take chances on securing a favorable verdict, and afterwards object to the manner in which the jury was selected." Ohio & M. Ry. Co. v. Stein, 140 Ind. 61, 39 N.E. 246, 247.

In Tarrance et al. v. State of Florida, 188 U. S. 519, 23 S. Ct. 402, 47 L. Ed. 572, the United States Supreme Court held:

"That the objections to the panel of grand juries because of alleged discriminations against negroes must be taken by pleas in abatement in accordance with the decisions of the Supreme Court of the state of Florida."

The procedure in this case has been fully settled in the case of Dumas v. State, 55 Okla. Cr. 43, 24 Pac. (2d) 359. The paragraph of the syllabus reads:

"Under section 2982, Okla. Stat. 1931, a challenge to the panel must be taken before the jury is sworn, and must be in writing, specifying plainly and distinctly the facts constituting the grounds of challenge." Watkins v. State, 49 Okla. Cr. 443, 295 Pac. 417; Roper v. State, 48 Okla. Cr. 301, 291 Pac. 157; Moore v. State, 48 Okla. Cr. 106, 289 Pac. 788.

The courts have universally held that the objections to a jury panel are waived where not made until after the close of the state's evidence. State v. McGhee, 336 Mo. 1082, 83 S. W. (2d) 98.

If taken advantage of by the proper proceedings before the jury was called and impaneled, there may have been merit in the defendant's contention that negroes were excluded from the jury panels in Tulsa county solely and only on the ground of their color and previous condition of servitude; but counsel chose to submit his case

to the jury that had been summoned to try the case and apparently was quite satisfied with the jurors in the box.

In Hicks v. State, 143 Ark. 158, 220 S.W. 308, in the first paragraph of the syllabus the Supreme Court of Arkansas said:

"The claim that defendants were discriminated against in that members of their race were not summoned to serve on either the grand or petit juries, and had not served for many years, was raised too late when first presented by the motion for a new trial." Tillman v. State, 121 Ark. 322, 181 S.W. 890.

In Hicks v. State, supra, a writ of certiorari was denied by the United States Supreme Court. Hicks, Petitioner, v. State of Arkansas, 254 U. S. 630, 41 S. Ct. 7, 65 L. Ed. 447.

The mere fact that there was no person of African descent on the jury summoned for the purpose of trying the accused does not of itself show the exclusion of such person because of race or color. A person of African descent charged with crime cannot of right demand the kind of jury, some of which shall be of his or her race, nor is a jury of that kind guaranteed by the Fourteenth Amendment to any race. We hold that the failure of the defendant to raise the question until his motion for a new trial came too late to be now considered.

This court has carefully studied the evidence against the defendant. The court correctly advised the jury as to the law applicable to the facts. The defendant was accorded a fair and impartial trial. The evidence is sufficient to sustain a conviction of murder, but in view of the circumstances surrounding the killing, and the fact that the deceased and the defendant had been having an argument and quarreling about a quarter the defendant

owed the deceased, showing that the deceased and the defendant were angry with each other, and the defendant in his testimony stated the deceased started to cut him with a knife, while all of the state witnesses contradicted the statement, we believe that the death penalty imposed should be modified to imprisonment in the state penitentiary for life, and as modified the judgment of the trial court is affirmed.

EDWARDS, P. J., and DOYLE, J., concur.