ALVA FLOYD MOORE v. STATE.

No. A-10106.   Oct. 14, 1942.

(130 P. 2d 114.)

Jeff R. Laird, of Ada, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, J.   The defendant, Alva Floyd Moore, was charged in the district court of Pontotoc county with the

crime of murder, was tried, convicted and sentenced to death, and has appealed.

The attorney for the defendant was appointed by the court. We compliment him upon the vigorous and earnest manner in which he has presented his client's cause.

The evidence of the state is substantially as follows:

Alf Hardage and his brother, Bill Hardage, owned and operated a Texaco filling station in the city of Ada. Alec Powell was a negro porter employed at the filling station. The defendant, a World War veteran, without any permanent home, lived occasionally with his brother and nephew in Ada. When the defendant was in Ada he loafed frequently at the filling station operated by the Hardage brothers.

Gene Caskey testified that on May 1, 1941, he first saw the defendant at Scotty's restaurant near the Hardage filling station; that at the request of defendant he drove him home after his coat; that defendant pawned the coat and they drove to Elizabeth's place on Broadway, where defendant bought a half-pint of whisky; that while he was with defendant, defendant took two drinks from the bottle; that defendant had a small pistol in his pocket which he showed to the witness; that defendant seemed upset and commenced crying and said that Scotty and defendant's brother had been mistreating him. Defendant pulled a small gun out of his pocket and said: "I had just as soon to shoot you as anybody." Witness then told of conversation had with defendant where defendant seemed to be worried about someone telling his nephew that he had borrowed some money from a laundryman in Ada. Witness left defendant in front of the Hardage filling station.

Bill Hardage, brother of the deceased Alf Hardage, testified that defendant had loafed at their filling station

off and on for about two years prior to May 1, 1941, the date of the homicide. He saw defendant at the filling station about 3 o'clock on May 1, 1941. Defendant had liquor on his breath and tried to borrow $17 and mentioned that he wanted to go to Sherman, Tex. That defendant had tried to borrow money from them frequently to buy whisky. This witness was not present when the incidents occurred which led up to the homicide.

J. F. Cromer, who was in the electric welding business at Ada, was a customer of the Hardage brothers. He came to the filling station about 4 o'clock, May 1, 1941. He and the deceased Hardage were visiting and joking with each other and he noticed the defendant six or seven feet away. That Alf Hardage gave him a torpedo match which exploded when he struck it. That he had not paid any particular attention to defendant until he saw him put a gun on Alf and tell him to get in a car which the deceased Alec Powell had just driven to the station. That when the defendant pointed the gun at Alf, Alf kidded and laughed and said all right and started out the door to the automobile. That defendant pointed the gun at Cromer and Cromer slapped it back and asked if it was loaded, at which the defendant replied: "You bet it is loaded, and I will shoot your guts out if you don't get away from here." Cromer walked on to his automobile, which was parked several feet from the automobile in which Alf Hardage and the negro porter Powell were sitting. That defendant followed witness to his car and threatened to shoot him, but finally left and went back to the car and ordered Alf Hardage to get under the wheel. That Cromer then got in his automobile and slammed the door. When the door slammed the defendant came running back to Cromer's automobile threatening to shoot. That Cromer then picked up a

gun which he had in the car, pointed it at the defendant and told him to put his gun up, whereupon the defendant wheeled and ran back and crawled into the back seat of the other automobile and ordered Alf Hardage to "Get out of here, take off." A chase then followed across town in which the witness secured the aid of a motorcycle cop. The cars were driven at a high rate of speed on the Fittstown road. Witness first noticed the negro porter laying with his head on the back of the front seat as if he had been shot. Later he saw Alf Hardage go down and the car swerved into a ditch and ran into a fence, where it was stopped. That he and the motorcycle cop ran up and ordered the defendant to come out of the car with his hands up. That defendant stuck his right arm out of the back window and waved a white handkerchief and later came out through the window. That defendant was shot through the jaw and was bleeding. Both Alf Hardage and Alec Powell were dead, with a single bullet wound in the back of their heads.

Quinton Blake, the motorcycle policeman, testified to the chase which he and Cromer made after the Hardage automobile. His testimony concerning the shooting and the other facts surrounding the homicide were substantially the same as that of Cromer.

He further testified that the gun which the defendant used held eleven cartridges, and that all of the shells had been fired except the last one, which hung in defendant's gun. He identified a picture of the automobile in which the parties were killed and pointed out seven holes in the car which were made from the inside. These bullet holes were at various places in the car, some of them in the top of the automobile and some through the window, indicating that the defendant had apparently fired aimlessly.

The defense interposed was insanity. The defendant and several other witnesses testified in his behalf. Their proof showed that the defendant served overseas in the first World War with the 90th Division. That he served in the front line trenches from August 1, 1918, until the armistice was signed, November 11, 1918, without relief. That many of the major conflicts which marked the turning point of that war were fought during this period. His certificate of discharge from the United States Army was introduced in evidence and it showed that defendant fought in four major engagements at St. Mihiel, Meuse-Argonne, Villersen-Haye, and Puvenelle. The proof further showed that the defendant, during one of the battles, was fighting in a shell hole with three of his buddies and that a large shell struck near them, completely covering the four with dirt and debris. That defendant had to be dug out of the shell hole and was the only one of the four who was alive. The defendant and his father had an unusually strong attachment to each other, and while the defendant was in France he received word that his father had died, which further unnerved him. That he had never drunk intoxicating liquor before he went to the war, but that upon his return he commenced drinking. That his mother died shortly after defendant returned from overseas, after which time the defendant wandered around from place to place without any permanent abode. That he spent a considerable time in veterans' hospitals in New Mexico, California, Kansas, and Muskogee, Okla.

A doctor at Ada testified that defendant's brother had brought defendant to him for examination a few months before the homicide, at which time the defendant was complaining of severe frontal headaches. That he could find no organic cause for this ailment and ad-

vised that defendant be taken back to the Veterans' Hospital at Muskogee.

The proof further showed that defendant was taken to Veterans' Hospital at Muskogee, where he stayed three weeks. That when they started to take him to the hospital he cried and asked them to take him to an asylum because he was going crazy. That he left the hospital without permission because they were fixing to operate on him.

The defendant admitted on cross-examination that he had been convicted of a felony in New Jersey and placed on probation, and that he had served six months in jail in California for petty theft.

The proof further showed that when the defendant was sober he was quiet and peaceful, but that when he was drinking he would get mad and get into trouble. The proof further showed that any sudden noise near him would cause the defendant to become very excited and nervous. Various incidents were related by witnesses where the defendant would jump and shake for 15 or 20 minutes when a car would backfire near him, or would be highly nervous during a thunderstorm. One of the witnesses, a photographer for an Ada newspaper, testified that he took a flash picture of the defendant at the preliminary examination. That the defendant was not expecting him to take the picture and when the light flashed the defendant jumped to his feet, threw his hands over his face, and showed the most violent reaction the photographer had ever seen exhibited by any person who had had his picture thus taken.

One of the officers who examined the two deceased shortly after the killing occurred testified that neither of them had any powder burns around their wounds,

which indicated that the gun was not held close to their heads when it was fired.

The defendant, in testifying concerning the incidents which occurred on the day of the homicide, stated that he did not remember talking to the various parties who testified that they had talked to him on that date. He testified that he did not remember getting the gun, which belonged to his nephew, and did not remember the many other incidents which occurred. That he considered Alf Hardage and Alec Powell both as his friends and neither had done anything to make him mad at them.

The other testimony on the part of defendant's relatives and friends was that the defendant, until the outbreak of the present war, would never talk of his World War experiences, but that after the present conflict started he constantly talked of his own war experiences and stated that he hoped the government would take the older men who had seen service in the other war and not ruin the lives of young men. It is quite evident from the testimony that the constant news and talk of war had refreshed defendant's memory of the days which he had served in the trenches of France.

There is some contention made in defendant's brief that the court erred in the giving of certain instructions and of his failure to give an instruction requested by the defendant, but the chief contention of counsel for defendant is that the punishment, under the circumstances, is excessive and should be modified to life imprisonment. In presenting his contentions concerning the alleged error in the giving of instructions or rejection of requested instructions, counsel states that if such was error on the part of the court, it should at least be grounds for the modification of the judgment.

We have examined the instructions which were given and the instruction requested by defendant and have found no error committed. The court might have been justified in giving an instruction requested by defendant to the effect that if they should believe defendant was intoxicated to the extent of lacking the mental capacity to form a premeditated design to take life, then he should only be convicted of manslaughter in the first degree; but his failure to do so is not error where the testimony of all the witnesses, both for the state and defendant, was that the defendant was not in a drunken condition. There were no facts testified to by any witness upon which such an instruction could be based. The witness who came the closest to testfiying to any such condition was the witness who stated that defendant had taken two drinks out of a bottle of whisky, but this witness stated that defendant was not drunk and all the other witnesses who talked to the defendant on that date, including those who saw him at the filling station and those who saw him immediately after he was arrested, stated that he was not drunk. Some of them stated that they could discern the smell of liquor on his breath, but that was as far as any of them went in testifying concerning any degree of intoxication. The theory of defendant was that the defendant was nervous over a quarrel with his nephew that day and became temporarily unbalanced because of the sudden noise caused by the explosive match and not because he had become mentally unbalanced due to being drunk. The defendant himself denied doing any drinking the day of the homicide. It is well settled that the defendant is not entitled to an instruction on an issue which is not raised by evidence. Gandy v. State, 34 Okla. Cr. 350, 246 P. 887. However, we shall consider this assignment in connection with the question of the modification of the judgment.

As to the other instructions complained of in the petition in error, we find that they are not discussed in the defendant's brief, and, after a careful reading of the instructions, we find that they are such instructions as have been repeatedly approved by this court in cases where an issue of insanity has been raised, and there is no merit to this assignment of error.

We now come to the question most seriously urged upon this court, as to whether the sentence of death should be modified to that of imprisonment for life at hard labor. This court has the power under section 3204, O. S. 1931, 22 O. S. 1941 § 1066, on appeal, to reverse, affirm or modify the judgment. The right of modification, however, is not unlimited. It must, as a matter of law, be within the limits of the punishment fixed by the statute for the offense for which the accused was convicted. It must further be the exercise of a judicial power, as distinguished from the executive power of commutation, reprieve, pardon or parole. The one is an award of justice and the other is an act of grace.

The power conferred on this court to modify a sentence as a judicial act makes it the duty of this court in a capital offense to examine the entire record and to carefully weigh and consider the evidence, including the evidence as to defendant's sanity at the time of the homicide, the instructions of the court given and those refused, in order to ascertain if, in the furtherance of justice, the judgment and sentence of death should be reduced to life imprisonment.

Defendant was a shell-shocked and wounded veteran of the World War. It is undisputed that prior to that conflict he was an ordinary, honest, American citizen, physically in good health and that he did not drink intoxicating liquors. Like many other of our citizens who

fought the bloody battles of that struggle, the war left its mark upon this defendant. The habit of some returned soldiers to turn to alcoholic liquor in an effort to forget the shock and frightful scenes which were burned upon their minds in those battles, and to forget the memory of dead buddies who had fallen around them, was very common in this country after the war had ended. It is common knowledge in Oklahoma and a fact frequently discussed by editorial writers and a fact within the personal knowledge of the writer of this opinion, that two of Oklahoma's greatest World War heroes have hardly drawn a sober breath since that conflict.

The defendant's physical condition has been such that he has spent many months in veterans' hospitals in various states. Sudden noises shocked his nervous system. It is reaasonable to conclude that the noise made by the explosive match upset his mental equilibrium and affected his actions. After he had started to leave in the automobile with Hardage he heard Cromer slam his car door and he left the Hardage automobile and ran over to the Cromer car. There is nothing in these actions to show a deliberate killer at work, but rather a highly nervous man reacting with abnormal violence to noises reminiscent of war.

It is true, as insisted by the state's attorney, that the overwhelming number of men who fought for their country on Flanders' field returned to this nation and settled back in their communities and have lived honorable and respected lives since that time. But that war did not affect all men alike. The physical and mental make-up of all men is not the same. The fact that a man who commits the crime is an ex-soldier and honorably served his country is no excuse or justification for his commission of a crime, but when it is shown, as in the instant

case, that the defendant honorably served his country and while so doing suffered shock and wounds which troubled him after that conflict had ended, then such circumstances should rightly be taken into consideration in determining whether such condition possibly contributed to the crime, and, accordingly, whether the judgment and sentence should be modified.

The shots fired by him in the fleeing automobile best illustrate his nervous condition. Five shots went through the top of the automobile scattered from front to back, one shot went through a side glass, one through the front windshield, one into the head of the passenger in the front seat and one into the back of the driver's head. There were no powder burns on the victims, which tends to indicate that the defendant sat in the back seat and fired the fatal shots, as it is reasonable to conclude that if he had held the pistol close enough to the deceased to insure a direct and fatal hit powder burns would have been inevitable. While the defendant committed certain actions which indicated that he knew what was going on, such as the holding of a white handkerchief out of the window which indicated that he wanted to surrender, still there are such circumstances surrounding the entire occurrence which show the workings of an abnormal mind.

The question of the sanity of the defendant has been submitted to a jury under proper instructions and they have made their finding that defendant was sane. The penalty of death as a punishment of crime is to be inflicted only in the most extreme cases. It is a matter of record that the members of this court favor the infliction of the death penalty in cases where the evidence and the law justifies. Here there was an utter lack of motive. Both of the deceased were friends of defendant. He had had no harsh words with the deceased, although

he had asked a brother of deceased to lend him money to go to Texas.

Honored and respected citizens have met their death in a shocking manner and wholly without provocation. It was so deplorable that an entire community was justly shocked. Ordinarily, the person committing such a homicide should be given the death penalty for his crime, but there are extenuating circumstances in defendant's background which impel this court to conclude that the sentence should be modified to life imprisonment.

If we are to literally apply the doctrine of an eye for an eye, tooth for a tooth, life for a life, then the defendant most certainly should be electrocuted. But if there is a place in our criminal jurisprudence where the courts should temper their judgments with mercy it is in the instant case and solely because of the physical and mental condition of the defendant which arose because of his participation in an armed conflict fighting for his country.

The defendant should not be pardoned. The citizenship of this state deserves protection and the defendant should be kept in confinement as punishment for his crimes until a natural death comes to him.

For the reasons hereinabove given, it is the judgment of this court that the judgment and sentence of death assessed against defendant by the district court of Pontotoc county be modified by reducing it to imprisonment in the State Penitentiary at hard labor for life, and the judgment and sentence, as thus modified, is affirmed.

BAREFOOT, P. J., and DOYLE, J., concur.

DOYLE, J. (concurring). In a capital case, the law of our state in its great humanity allows the jury, after they have first determined the question of guilt,

to assess the punishment, which may be death or imprisonment for life at their discretion, and, even after the jury say that the defendant should suffer death, this court, in furtherance of justice, has the power to modify the judgment to imprisonment for life. Section 3204, O. S. 1931, 22 O. S. 1941 § 1066. In the case of Fritz v. State, 8 Okla. Cr. 342, 128 P. 170, 177, we said:

"The power of this court to modify a judgment inflicting the death penalty for murder to imprisonment for life at hard labor when deemed proper in the furtherance of justice is in no sense the power of commutation of the sentence of the lower court. Commutation can be granted only by the chief executive of the state, and is granted as a matter of clemency. The judicial power to modify a judgment and sentence and the executive power to pardon, parole, or commute are wholly distinct in their nature. The one is an award of justice and the other is an act of grace. Commutation is a matter of discretion and may be refused. Justice is imperative, and must not be denied. The fact that the Governor has the power to commute does not abridge the defendant's right to appeal to this court for relief. In other words, this provision of our criminal procedure act makes it the duty of this court to review the record, and in a proper case, if necessary in the furtherance of justice, modify the judgment so as to prevent the imposition of punishment which the evidence will not warrant."

See Owen v. State, 13 Okla. Cr. 195, 163 P. 548; Chambers v. State, 16 Okla. Cr. 238, 182 P. 714; Wilson v. State, 17 Okla. Cr. 47, 183 P. 613; McConnell v. State, 18 Okla. Cr. 688, 197 P. 521; Young v. State, 19 Okla. Cr. 363, 200 P. 260; Walker v. State, 20 Okla. Cr. 319, 202 P. 799; Peters v. State, 22 Okla. Cr. 245, 211 P. 427; Phillips v. State, 27 Okla. Cr. 108, 225 P. 180; Doublehead v. State, 27 Okla. Cr. 375, 228 P. 170; Bradley v. State, 31 Okla. Cr. 194, 237 P. 625; Goben v. State, 32 Okla. Cr. 237, 240 P. 1085; Manwaurin v. State, 35 Okla.

Cr. 220, 249 P. 966; Johnson v. State, 35 Okla. Cr. 212, 249 P. 971; Hubka v. State, 40 Okla. Cr. 161, 267 P. 864; Holford v. State, 57 Okla. Cr. 431, 48 P. 2d 1082; Mitchell v. State, 59 Okla. Cr. 345, 60 P. 2d 631; Methvin v. State, 60 Okla. Cr. 1, 60 P. 2d 1062; Murphy v. State, 72 Okla. Cr. 1, 112 P. 2d 438.

No more solemn duty can be imposed upon the courts than the duty of protecting, and the duty of taking, human life. To take the life of a human being is an awful thing, even when it is taken by the law.

Upon a careful examination and consideration of the entire record, my conclusion is that for the reason stated, the punishment imposed is excessive and for this reason the jury abused its discretion in assessing the extreme penalty of the law, and that justice requires that the judgment and sentence of death should be modified to provide that the defendant, Alva Floyd Moore, be imprisoned in the State Penitentiary for life at hard labor, instead of that he suffer death by electrocution.