# HARDY POWELL v. STATE.

No. A-9032. Sept. 10, 1936.
Rehearing Denied Dec. 31, 1936.
(63 Pac. [2d] 113.)

Frank Leslie, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error was convicted in the district court of Tulsa county of murder and sentenced to life imprisonment. Motion for new trial was filed, and the record properly saved, and the defendant appeals.

The deceased and defendant were both negroes; they met at the home of Frankie Kelly; the defendant, his wife, and a negro by the name of Will Lawson went to the Kelly home prior to the time the deceased and a man by the name of Thomas came; when Thomas and Harry Goldsby came the other parties were all in the front room talking; Thomas and Goldsby came to the back door and knocked, and were admitted to the kitchen by Frankie Kelly who was cooking something in the kitchen; when Goldsby came in he told Frankie he was hungry and she gave him something to eat; Goldsby took a bottle of gin from his pocket and put it on the table and wanted them to have a drink; Frankie called the other parties in the front room to come and have a drink; Mary Johnson, the common-law wife of the defendant Hardy Powell, was in the room, and it was claimed by some of the witnesses that Harry Goldsby went in and got Mary and Frankie by the hand and pulled them into the kitchen for the purpose of having a drink; when they went into the kitchen the defendant in this case went into the middle door or somewhere near there, and claimed that the deceased was acting improperly toward his wife and using cuss words, and that he reprimanded him, and asked him to not use cuss words any more in the presence of the women, and the deceased applied some kind of a vile name or

epithet to him, and that Mary Johnson got between the deceased and the defendant and kindly pushed him and told him not to do anything, and the defendant put his hand back toward his hip pocket, and was finally pushed back into the east room and the door between the two rooms was closed; immediately thereafter Frankie claims the door was partly opened and she claims to have seen the muzzle of a pistol.

The testimony further shows that the deceased was the one who opened the door between the two rooms, and in the meantime before the door was opened the deceased had picked up from the cabinet what the witnesses call a tack hammer. The proof shows the tack hammer was in the possession of the prosecution but was not introduced in evidence. No one gives the size of the hammer. The deceased started into the room where the defendant was, and as he got to the door or just into the room where the defendant was the defendant shot him, from the effects of which he died. The pistol fell out of the defendant's hand and fired again but did no one an injury, the defendant contending that deceased, when he opened the door and started in the room where he was, knocked the pistol out of his hand.

The testimony of the state witnesses and the defendant's is not in harmony, but in substance it is practically the same. It seems to have been a meeting of a bunch of negroes, all of whom had been drinking, and the deceased put the bottle of gin on the table and all of them took another drink; and from the action of the deceased and the remarks made in the presence of Mary Johnson and Frankie Kelly he aroused the anger of the defendant.

The state witness Frankie Kelly testified when the defendant was in the living room with the door closed

the deceased was pecking around with the tack hammer; Frankie says she knew the deceased was mad. Thomas thought the deceased was singing some kind of a song. All of the testimony of both the state and the defendant, and of the eyewitnesses for the state, shows that something transpired between the defendant and the deceased in the kitchen that caused the wife of the defendant to anticipate there was going to be trouble, and she pushed her husband back in the living room and closed the door. The witnesses are not in harmony as to what caused the defendant to go back into the living room from the kitchen where the deceased was with the hammer, but they all admit the door was closed, and when the door was opened they all admit the deceased had started through the door when the defendant fired the shot.

Several witnesses were called by the defendant to show his previous good character for being a peaceable, law-abiding citizen. The defendant contends in his testimony that the deceased knocked the pistol out of his hand. The deceased and the defendant had never had any trouble before. The foregoing is the substance of the testimony offered by the state and the defendant.

The defendant assigned a number of reasons why this case should be reversed, and argues most of them together. His first argument is, that the verdict is contrary to the evidence, and is not supported by the evidence.

The killing is admitted by the defendant, but the defendant insists that it was a justifiable killing and that the defendant should be acquitted. The instructions of the court are not complained of, except the defendant offered some special instructions that were refused by the court, but an examination of the record clearly shows that the court covered all of the questions fully in its

instructions, therefore it was not error to refuse to give the special instructions requested by the defendant.

In presenting his argument and analyzing the same the defendant takes the position that he was not the aggressor in this trouble; that when he spoke to the deceased about the language he was using in the presence of the women the deceased used a violent and profane epithet, and picked up a hammer, designated as a tack hammer, and started toward the defendant. The defendant admits he reached back and threw the safety catch off his pistol; that the common-law wife of the defendant, Mary Johnson, got in between the deceased and defendant and told him not to do anything, and gradually pushed him back until he was in the living room and the door was closed between the two rooms.

Frankie Kelly, a witness for the state, and all the other witnesses admit the door was closed or partly closed, and Frankie says when she looked toward the door it was open or partly open and she saw the muzzle of a pistol; at that time, or just before that time, she knew the deceased was mad; that he had picked up a hammer and was pecking around on a cabinet.

All through the record the hammer is spoken of as a tack hammer. Just what a tack hammer is, is not shown by the record, nor is the size of this hammer shown. The record does show the hammer was in possession of the state but was not introduced in evidence. This court will take judicial notice that tack hammers are of various sizes, there are small and large tack hammers, as well as small and large tacks. Under the evidence as to the tack hammer the court cannot say whether or not this hammer was a dangerous weapon. As the defendant had no knowledge of the size of the hammer, and only saw the hammer

when the deceased started toward him with it, the question to be decided is, how would it appear to the defendant situated as he was, and did he believe it was such a weapon that the deceased might do him bodily harm or kill him. Hammers properly wielded are dangerous weapons, and in the hands of a drunken negro no one can tell what injuries might be inflicted by the use of one.

The parties were practically strangers and had never had any trouble before. The killing occurred on the spur of the moment, and as shown by the record in a heat of passion and at least without premeditation or intention on the part of the defendant to commit murder. The defendant insists he fired the shot to keep the deceased from doing him great bodily harm or taking his life with the hammer he had in his hand. All of the testimony was submitted to the jury and the court in detail explained the different degrees of homicide of which the defendant might be convicted, defining murder and manslaughter in the first degree, and the jury returned a verdict of murder, fixing his punishment at imprisonment for life. The defendant argues that the punishment fixed by the jury is excessive, and that he could not be guilty of the crime of murder; that a crime, if any was committed by him, was manslaughter in the first degree; that the conviction should be reduced from murder and life imprisonment to manslaughter and such sentence as the court might feel the facts warranted under the modification from murder with life imprisonment to manslaughter.

The next assignment argued by the defendant is: "The court erred in overruling defendant's objection to going to trial before the jury panel called for this criminal docket, for the reason that the defendant was a negro

citizen and that negro citizens were systematically excluded from the jury."

When the case was called for trial both sides announced ready, and the defendant for the first time made an oral objection to being tried before the jury for the reason that negro citizens of Tulsa county had been systematically ruled off the jury panel. No proof was offered at the time to support the objection made by the defendant, nor was there any written motion filed by the defendant prior to the trial objecting to the jury panel and moving to quash the panel, or a plea in abatement on the ground that negroes had been excluded from the jury solely and only on the ground of their race and color.

The Fourteenth Amendment to the Constitution of the United States is in part as follows:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Constitution of the state of Oklahoma declares that the Constitution of the United States is the supreme law of the land. The defendant, in his argument, insists that negroes were excluded from the jury service in Tulsa county solely and only on the ground of their race and color, and that by so doing they were discriminated against and deprived the defendant of his constitutional right, and that he did not have due process of law, citing in support of his contention Patterson v. Alabama, 294 U. S. 600, 55 S. Ct. 575, 79 L. Ed. 1082; Norris v. Alabama, 294 U. S. 587, 588, 55 S. Ct. 579, 79 L. Ed. 1074; and several other cases.

In each of the cases cited by the defendant the record shows that the motion to quash the panel, or the indictment, or a plea in abatement was filed in writing before the case was called for trial, and testimony taken to show the allegations that negroes had been excluded from the jury panel solely and only on account of their race and color. The record in this case fails to show that the defendant at the proper time, before the case was called for trial, protected his rights as provided by the Constitution of the United States and the state of Oklahoma, and the decisions based thereon by the United States Supreme Court, therefore the cases cited by the defendant disclose a different state of facts to the facts in this case, and the decisions are not in point.

The record shows when this case was called for trial both parties announced ready, and the defendant made an oral objection to going to trial on the ground that negroes had been excluded from the jury panel solely and only on account of their race and color; which objection was overruled, and exceptions saved, and the case proceeded to trial.

In support of his motion for a new trial, the defendant offered testimony to show that negroes had been excluded from the jury panels in Tulsa county for many years. The courts are uniform in holding that, where an eligible class of persons are excluded from the petit jury panel, a challenge to the panel is the proper remedy of one whose interests are affected. There is no law requiring that negroes should be selected to sit upon juries. 35 C. J. p. 245; McIntosh v. State, 8 Okla. Cr. 469, 128 P. 735.

The only law upon this subject is that negroes must not be excluded from the jury solely on account of their race or color. Under section 2982, O. S. 1931:

"A challenge to the panel must be taken before a jury is sworn, and must be in writing, specifying plainly and distinctly the facts constituting the ground of challenge." Dumas v. State, 55 Okla. Cr. 43, 24 Pac. (2d) 359; Wilson v. State, 17 Okla. Cr. 47, 183 Pac. 613; Watkins v. State, 49 Okla. Cr. 443, 295 Pac. 417.

Where an elgible class of persons is excluded from the petit jury panel, a challenge to the panel is the proper remedy of one whose interests are affected. 52 A. L. R. 923, 924.

In State v. Banner, 149 N. C. 519, 63 S. E. 84, the court said:

"A challenge to the array after plea of not guilty is too late."

"A party cannot thus take chances on securing a favorable verdict, and afterwards object to the manner in which the jury was selected."

In Tarrance v. Florida, 188 U. S. 519, 23 S. Ct. 402, 47 L. Ed. 572, the United States Supreme Court held that objection to the panels of grand jurors because of alleged discrimination against negroes must be taken by pleas in abatement in accordance with the settled rule of the state courts.

In Hicks v. State of Arkansas, 143 Ark. 158, 220 S. W. 308, the Supreme Court of Arkansas held the claim that defendants were discriminated against in that members of their race were not summoned to serve on either the grand or petit juries, and had not served for many years, was raised too late when first presented by a motion for a new trial.

In Hicks v. State of Arkansas, supra, a petition for a writ of certiorari was denied by the United States Supreme Court in 254 U. S. 630, 41 S. Ct. 7, 65 L. Ed. 447,

which ruling was approved by this court in Mitchell v. State, 59 Okla. Cr. 345, 60 Pac. (2d) 631. The fact that there were no persons of African descent on the jury summoned for the purpose of trying the accused does not of itself show an exclusion of such person because of race or color. A person of African descent charged with crime cannot of right demand the kind of jury, some of which shall be of his or her race, nor is a jury of the kind guaranteed to any race by the Fourteenth Amendment to the Constitution.

In the case of Carrick v. State, 41 Okla. Cr. 336, 274 Pac. 896, 898, it appears Jewell Carrick, a colored girl, killed Henry Ausler, a colored man, by stabbing him to death with a knife. The jury returned a verdict finding the defendant Jewell Carrick guilty of murder and assessing her punishment at death. The judgment was reversed for error of the trial court in overruling the defendant's challenge to the panel, for the reason that the facts in evidence were sufficient to sustain the motion to quash the panel of jurors, in that it appeared the jury commissioners had purposely excluded from the jury list, because of their color, citizens of the African race, qualified to perform jury service.

In the opinion it is said:

"It is well settled that a denial to citizens of the African race solely on the ground of their race and color of the right or privilege accorded to white citizens of participating as jurors in the administration of justice is a discrimination contrary to the Fourteenth Amendment of the Constitution of the United States, which declares that: 'No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor

deny to any person within its jurisdiction the equal protection of the laws.'

"The Constitution of the state of Oklahoma declares that: 'The Constitution of the United Sates is the supreme law of the land.' Const. art. 1, § 1.

"The Supreme Court of the United States has repeatedly held that a person of African descent accused of crime is denied the equal protection of the laws, contrary to the guaranty of the Fourteenth Amendment, if citizens of the African race are excluded from service upon the grand jury returning the indictment against him or the petit jury before whom he is placed upon trial solely because of their race or color. Strauder v. West Virginia, 100 U. S. 303, 25 L. Ed. 664. And it makes no difference whether such exclusion because of race and color is effected by a statute or by the arbitrary and wrongful acts of the officers in the administration of the law. Gibson v. Mississippi, 162 U. S. 565, 16 S. Ct. 904, 40 L. Ed. 1075; Carter v. Texas, 177 U. S. 442, 20 S. Ct. 687, 44 L. Ed. 839.

"The fact that there were no persons of African descent upon the list of jurors selected by the jury commissioners, or summoned for the purpose of trying appellant does not of itself show the exclusion of such persons solely because of race or color. Martin v. Texas, supra [200 U. S. 316, 26 S. Ct. 338, 50 L. Ed. 497]."

The motion of the defendant came too late to be considered by this court.

The court has carefully studied the evidence against the defendant. The jury was correctly advised by the trial court as to the law. The defendant was accorded a fair and impartial trial. There is sufficient evidence to sustain a conviction of murder. Finding no errors in the record warranting this court in granting the defendant a new trial, the judgment of the trial court is affirmed.

EDWARDS, P. J., and DOYLE, J., concur.