# DOLPH MORRIS v. STATE.

No. A-9217.   Sept. 2, 1937.
(71 Pac. 2d 514.)

Brett & Brett and R. A. Howard, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Robert W. Richards, Co. Atty., for the State.

BAREFOOT, J.   The defendant was charged with the crime of murder, for the killing of Simon Marshall, in Carter county, Okla., on the 5th day of February, 1936. He was tried and convicted of manslaughter in the first degree and sentenced to serve a term of twelve years in the penitentiary, and he appeals.

The evidence reveals that the defendant is a full-blood Choctaw Indian, 30 years of age; that on or about the 5th day of February, 1936, the defendant and his wife received word that her sister had died; that immediately they went to a place in Ardmore known as "The Canteen," and purchased whisky two different times, and she proceeded to get drunk; that along late in the afternoon they drove out east of Ardmore for the purpose of informing her aunt of the death of her sister; her aunt was not at home and they started back toward Ardmore; it was dark but the moon was beginning to come up; his wife got out of the car and while out began to hollow and scream; the defendant testified that he got out of the car for the purpose of assisting his wife back in the car, and that he had his arms around her when some one caught hold of his shoulder and jerked him; he did not know who it was and, as he said, he "thought it was some one trying to rob or hijack him," and that he whirled and struck the party in the dark; that after he struck this party some one clinched him; he did not know whether it was the same man or not; that they grappled and scuffled and both fell to the ground together; that while scuffling on the ground he felt something like a rock and hit the man who was on the ground with him. The party asked him not to hit him any more and he did not do so. He asked the man who he was and for the first time learned that he was the man who lived some distance up the road. He testified that there was no one there except his wife and that about 15 minutes thereafter Mr. Bullard and his wife came down there. He asked him who he was and he said he was Mr. Bullard. He testified that he did not know the parties and had no animosity against them and was doing only what he thought necessary to protect himself from injury and

great bodily harm. He further testified that he was not drunk at the time and knew what he was doing.

The wife of defendant was so drunk that she did not remember anything that happened after she got out of the automobile.

The witnesses for the state, Mr. and Mrs. George Bullard, testified that they lived about two miles east of Ardmore on the highway; that he was 69 years of age, and that her stepbrother, Simon Marshall, who was visiting them, was 71 years of age; that on the evening of the 5th day of February, 1936, some time after 7:30 p. m., they heard terrible screams and thought some one was in distress; that it continued on so long that Mrs. Bullard urged her husband and stepbrother to go and see what it was; that they had been gone some time and she became uneasy about them, when Mr. Bullard came up all exhausted and worn out and sank into a chair and said, "Send for the police." After calling them she asked where Simon was, and he said "he is down there lying in the road." They both went down there and she saw her stepbrother lying in the road with his head bruised and blood gushing out of the side of his head. Defendant and his wife were there about 25 feet from where deceased was lying. She held the head of deceased until the officers arrived and he was taken to the hospital at Ardmore, where he died on February 10, 1936, as a result of the wounds he had received.

· The doctors testified that he received a wound over the left eye which fractured his skull, and that this was the cause of his death. They also testified that he had many bruises and scratches on and about his face and body, and that his jaw was broken.

The testimony of George Bullard was that when he and deceased went to the scene of the difficulty they saw the wife of defendant sitting at the side of the road cursing and abusing her husband; that defendant asked him who he was and he told him he was George Bullard, and he wanted to know where he lived, "and I told him up in that house there." He testified further, as follows:

"Q. What took place then? A. I don't think anything. I went in the ditch, I was knocked unconscious. Q. At the time you were struck did you make any effort to talk to this party? A. No, sir, I walked up and stood there and he asked me my name and I told him. Q. Whereabouts was he? A. Maybe 12 or 15 feet from her up toward the middle of the road. Q. Twelve or fifteen feet up toward the middle of the road? A. Yes. Q. You and Mr. Marshall were there in the middle of the road? A. Yes, sir. Q. Did any other conversation take place there except what you stated? A. I didn't hear any. Q. Whereabouts was Mr. Marshall standing as regards to you? A. When he was standing there, Mr. Marshall was on the left side; we was facing to the west toward him. Q. The defendant? A. Yes. Q. Was it dark when you got there? A. The moon was kinda coming up from behind the house, it throwed a shadow. His car was on the north side. Q. Which side of the road was this woman on? A. On the south side of the road just below the car. Q. How far were you standing from the automobile at the time you were struck? A. I couldn't say, it was a little bit shadowy dusk down there but it might have been 20 or 25 feet, something like that. Q. And the defendant or the party later identified as the defendant was, you say, about 15 feet away from the woman who was in the bar ditch when you came up there? A. Somewhere about there. Q. Mr. Bullard, did you walk to him or did he come to you? A. I couldn't say, I didn't see him, the first thing I knew he hit me and knocked me out and I couldn't tell how he moved. Q. You were standing there? A. Yes, we were a little difference apart. Q. Was that when the

conversation took place, when he asked you who you were? A. Yes, sir, then I was struck and I didn't know no more for awhile until I came to. Q. Did you see anyone else there besides the man and woman and Mr. Marshall? A. No, sir. Q. When you regained consciousness what did you do? A. I came crawling out of the ditch and saw Mr. Marshall laying there with blood running out the side of his head and blood on his arm, and I think he had his cap on. I went on up to the house and it took a long time to get there, I went in and dropped in a chair. Q. Whereabouts were you struck? A. I am not certain whether it was here (indicating) or back here (indicating). Q. What did you do? A. I told my wife to phone for the police; she phoned for the police and then she and I went back down there. * * * Q. When you went down there it was pretty dark, was it? A. The moon was kinda in behind the house, but it was coming up. Q. Did you know the defendant at that time? A. I did not; I had never seen him that I know of."

Jones DeArman, a policeman, testified to going to the scene of the difficulty about 8:15 p. m., and seeing the parties as has been testified to by Mrs. Bullard; that he asked the defendant "Who did this?" and he said, "It was Hunter Pickens' boy." He then testified as follows:

"Q. What occurred after that? A. I said, 'Where is the boy?' and he said, 'I don't know,' and I said, 'Have you seen the boy?' and he said, 'No.' I said, 'Why did you tell me he did it?' He said, 'Well, he is a bad boy.' "

Howard Johnson, a policeman, testified to going to the scene with Officer DeArman and corroborated his testimony with reference to the location of the parties, and he further testified that he found a rock upon which there was blood and hair, lying beside the road. This rock was introduced in evidence, and a picture of the same, and a picture of the cap worn by deceased at the time of the difficulty, are both attached to the record. He further

testified that the defendant, while being carried by him from the city jail to the county jail, admitted that he did it. Both of these officers testified that defendant was drunk at the time they arrested him at the scene of the difficulty.

The first assignment of error urged by defendant is that the court erred in overruling his motion challenging the jury panel. The ground for this motion being that the defendant was a full-blood Choctaw Indian and that there was a large number of full-blood Choctaw Indians in Carter county who were qualified to act as jurors, but because of their race they were excluded from the jury list prepared by the jury commissioners. The only testimony offered by the defendant to support this contention was the introduction of the jury list of the district court of Carter county for the first half of the year of 1936 containing 230 names. No testimony was introduced in explanation of this list or to show to what race any of the jurors belonged. The court made a voluntary statement to the jury outlining the procedure followed in the selection of the jury commissioners and in reference to full-bloods being on this particular panel said: "I don't know of any there. I just looked over the list." No evidence was introduced to show that there were or were not full-bloods upon the jury panel, nor whether or not any of Indian blood were upon the panel. The court at one time made the voluntary statement that he saw upon the list some who were of Indian blood. Under these circumstances and the holdings of this court, there was no error in the overruling of the motion of the defendant to set aside the jury panel. The burden was on defendant to prove that full-blood Indians were excluded from the jury panel solely on account of their race. A careful examination of the record discloses no such evidence. Defend-

ant having failed to offer any proof on this question to meet this burden, it was not error for the court to overrule the challenge. Scott v. State, 29 Okla. Cr. 324, 233 Pac. 776; Hollins v. State, 56 Okla. Cr. 275, 38 Pac. (2d) 36; Powell v. State, 60 Okla. Cr. 267, 63 Pac. (2d) 113; Maddox v. State, 12 Okla. Cr. 462, 158 Pac. 883.

It is next urged by the defendant that the giving of instruction No. 7, which dealt with justifiable homicide, was error. The defendant cites no authority showing any error in this instruction. We have carefully examined the same, and find that the instruction was very favorable to the defendant, and that there was no error therein.

It is next urged by the defendant that the verdict of the jury is not supported by the evidence, and is contrary to law, and that the jury was influenced by passion and prejudice. All of these errors may be considered together. The facts surrounding this killing are shrouded in doubt for the reason that none who were there know how it happened. Neither the defendant nor the deceased knew each other. There was no provocation for the killing. The defendant testified that he was sober and attempts to justify his action that he thought he was being robbed or hijacked. Both the officers testified that he was drunk at the time they arrived, and this seems to be the most reasonable solution of this killing. There is no reason why the two old men, one 69 and the other 71 years of age, going out under the circumstances they did in this case, should provoke a difficulty with a young, full-blood Indian, 30 years of age, with whom they were not acquainted, and whom they had never seen.

The jury in this case saw the witnesses upon the stand, heard their testimony, and rendered a verdict of guilty. There is nothing in the record which would jus-

tify us in saying that this verdict is contrary to law. There is sufficient evidence in the record to warrant the jury in returning a verdict of guilty.

We have carefully weighed the facts and have come to the conclusion that the ends of justice would best be met by reducing the sentence assessed against this defendant to a period of six years in the penitentiary.

It is therefore ordered that the sentence in this case be reduced to six years, and as thus modified, the judgment of the district court of Carter county is affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.